THIRD DIVISION

No. 1-08-2106

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County, Illinois. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 07 CR 16141 (01) |
| | ) | |
| CHRISTOPHER DAWSON, | ) | Honorable Joseph M. Claps, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

PRESIDING JUSTICE MURPHY delivered the opinion of the court:

Following a bench trial, defendant, Christopher Dawson, was found guilty of three counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(A)(2) (West 2006)) and two counts of aggravated unlawful use of a weapon (AUUW) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2006)). Defendant was sentenced to concurrent terms of eight years' imprisonment for the aggravated discharge of a firearm convictions and three years' imprisonment for the aggravated unlawful use of a weapon convictions. Defendant was also assessed a $5 court system fee pursuant to section 5-1101(a) of the Counties Code (55 ILCS 5/5-1101(a) (West 2006)).

On appeal, defendant argues that the aggravated unlawful use of a weapon is unconstitutional following the decisions of the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S.__, 171 L. Ed. 2d 637, 128 S. Ct. 2783 (2008) and *McDonald v. City of Chicago*, No. 08-1521 (U.S. June 28, 2010) (plurality op.). Defendant also asserts that

his convictions should be reversed because the evidence presented by the State was insufficient.

Third, defendant claims that several of his convictions should be vacated under the one-act, one-crime rule because the charging instruments fail to contain allegations of distinct physical acts.

The State concedes that the conviction under count III for aggravated discharge of a firearm at an occupied vehicle should be vacated as it is based on the same operative facts supporting defendant's conviction in count IV. The State also concedes that there was no evidence as to defendant's ownership rights to the property where the second shooting occurred. Therefore, it concedes that the conviction under count VII, for AUUW must be vacated.

Finally, defendant contends, and the State concedes, that the $5 court system fee should be vacated because his convictions did not violate the Counties Code. Accordingly, that charge is vacated. For the following reasons, the judgment and sentence against defendant are affirmed in part and reversed in part.

## I. BACKGROUND

Defendant was arrested in the early morning hours of July 24, 2007, in connection with two shootings that occurred earlier that day. Defendant was charged with the attempted murder of Mario Brantley, aggravated discharge of a firearm at a vehicle, aggravated discharge of a firearm at Mario Brantley, AUUW, and aggravated unlawful restraint. Defendant and codefendant Cedric McRay were tried simultaneously in a severed bench trial.

At trial, the State first presented Mario Brantley's testimony. Brantley testified that on July 23, 2007, he was driving his car when a light-colored vehicle driven by defendant with McRay in the passenger seat pulled up next to him. Brantley was friends with both men, but they

"had a few words" at this time. At approximately 2:15 a.m. on July 24, 2007, Brantley was a "little intoxicated" and driving to purchase some cigarettes on the way to his baby's mother's house. The same light-colored car from the earlier confrontation approached him and he drove into an alley near South Green Street and West 53rd Street. The car followed him into the alley and he heard someone say "what up?"

Brantley testified that when he looked out the window he heard several gunshots from the light-colored car. Brantley sped off and then drove around for a while to make sure that he was not hit and that his vehicle was all right. Brantley testified that he encountered a marked police car and flagged it down. Brantley told the police officers what happened and that he knew where defendant lived.

Brantley led the police to the scene of the shooting and then to defendant's home. Brantley saw the light-colored vehicle at the side of defendant's home and when he approached the house he heard someone say "[t]here go Mario." At that time, someone came out of the front door of the house and four or five shots were fired. Brantley drove off immediately, but heard shots hit his vehicle. He soon returned to see the police approaching the house. Brantley saw a flash when the shooting occurred, but testified that he could not see who was shooting.

Brantley was questioned on his testimony given in court a week after the incident. The testimony was elicited for the purpose of admitting the statements as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963. 725 ILCS 5/115-10.1 (West 2006). Brantley admitted that he had testified under oath that in the first shooting, defendant and McRay started shooting at him after asking him "what's up?" Brantley also admitted that he previously

testified that in the second shooting, he saw defendant and McRay come toward him from the house with handguns and start shooting at him. The State also elicited testimony from Brantley regarding his four prior convictions in 2001, 2002, and 2004 on various narcotics charges and on unlawful use of a weapon by a felon.

Brantley admitted on cross-examination that, in his statement to the police, he stated that the first shooting occurred minutes after the first conversation with defendant and McRay. He also admitted that he told police that he saw defendant shooting at him in the first incident. However, Brantley testified at trial that he could not see the shooter.

Detective Paulette Wright testified that on July 24, 2007, she arrived at the police station at about 8:30 a.m. and spoke with Brantley. Brantley did not appear intoxicated. Wright testified that her reports indicated that Brantley first identified McRay, but not defendant, as the shooter in the first shooting. Wright was also present for Brantley's statement to the assistant State's Attorney. Brantley identified defendant as the driver of the light-colored car during the first shooting. He also indicated that the two incidents occurred minutes apart from each other.

Officer Tom Rosales testified that on July 24, 2007, at approximately 2:26 a.m., he and his partner, Officer Steve Schmid, were on patrol and responded to a radio call of shots fired at West 53rd Street and South Halsted Avenue. At about West 53rd Street and South Sangamon Street, Brantley flagged the officers down from his vehicle and told them that he was the victim of a drive-by shooting. Rosales followed Brantley to 918 West 52nd Street from about two car lengths behind. When they approached, Brantley slowed down and Rosales was approximately one car length behind when he saw two men open fire as they stood in front of the building.

Rosales testified that he heard 8 to 10 shots fired.

Rosales testified that he turned on his spotlight, illuminating two subjects whom he identified as defendant and McRay. The offenders turned toward the police and then turned to go back into the residence. Rosales testified that he saw defendant throw his weapon in the gangway between the residence and the adjacent residence. Rosales and Officer Andrew Thomas went to the gangway and retrieved the handgun that defendant had thrown. Rosales testified that about one minute elapsed between the time the gun was thrown and when Thomas retrieved it. Rosales never lost sight of the gangway where the gun was thrown.

While in the gangway, Rosales saw defendant lean out of a window of the residence and throw a handgun on the roof. Rosales testified that McRay then also leaned out of the window and threw another handgun toward the roof. However, the gun hit the roof and fell to the ground between Rosales and Thomas. Rosales testified that they secured the handguns and then entered the residence and placed defendant, McRay and a third person into custody. The Chicago fire department was summoned and Officer David Tencza climbed a fire ladder to the roof to retrieve the third handgun.

Rosales testified that the weapons were taken to the police station and he detailed the process that was followed to enter them into evidence. Rosales testified that the handgun recovered by Thomas was a 9-millimeter Luger, the second handgun that he recovered from the gangway was a .45-caliber Taurus, and the handgun retrieved from the roof was a Bersa Thunder 380.

On cross-examination, Rosales testified that he did not observe any behavior indicating

that Brantley was intoxicated and did not question him regarding the shooting, but followed him to the scene. Rosales admitted that his incident report detailed that he was following at approximately three or four car lengths behind Brantley but that he testified that he was one or two car lengths behind Brantley during this time. He also testified that it was dark and there were no streetlights where the shooters fired their weapons.

Officer Thomas testified that, on July 24, 2007, he was dispatched to the scene of the shooting at approximately 2:25 a.m. and he heard shots fired while en route to the scene. When he arrived at the scene, Thomas went to the gangway and recovered a High Point 9-millimeter Luger. Thomas testified that he carried the weapon until he returned to the police station to enter the weapon and its magazine into evidence. Thomas admitted that he never saw defendant fire any handgun.

Officer Tencza testified that he responded to a call to assist in shots fired at 918 West 52nd Street at approximately 2:35 a.m. on July 24, 2007. Approximately 10 squad cars were on the scene when he arrived and the Chicago fire department reported to the scene soon thereafter. Tencza testified that he climbed a ladder to the roof and recovered a .380-caliber Bersa handgun and two empty magazines. Tencza testified that he placed the weapon and magazines into inventory upon returning to the police station. Tencza did not witness defendant engage in any illegal conduct.

Physical evidence was presented by stipulation and the testimony of evidence technicians. Ballistics evidence linked the .45-caliber Taurus recovered by Rosales to five shell casings found outside 918 and 920 West 52nd Street, one bullet found in the trunk of Brantley's vehicle, one

bullet found in a vacant lot at 916 West 52nd Street, and one of the magazines recovered from the roof. The Bersa .380-handgun found on the roof of the building was linked to two shell casings and one bullet fragment found in the alleyway, a bullet fragment found in the trunk of Brantley's vehicle, and the other magazine recovered from the roof of the building. The 9-millimeter Luger was linked to a shell casing recovered near 920 West 52nd Street, four shell casings recovered from inside the light blue Oldsmobile parked near 918 West 52nd Street, a bullet fragment from the alley near West 53rd Street, and one magazine. Brantley's vehicle had five apparent bullet strikes in the rear and left side.

The trial court struck several counts upon defendant's motion for directed verdict based on a lack of evidence presented. After closing arguments, the trial court stated that it had considered the evidence, the credibility of witnesses, and arguments of the parties. The trial court explicitly noted the statement given by Brantley to the assistant State's Attorney that was introduced as substantive evidence. Defendant was found not guilty of several counts because the State failed to present evidence to prove elements of those counts. For the attempted murder counts, the trial court found defendant not guilty. The trial court stated that, based on the "relatively short distance between the shooters and the shootee, Mr. Brantley, one can only come to the conclusion that the two individuals firing the shots are horrendous shooters or their intent was to shoot up the car and scare Mr. Brantley and not kill him. * * * Do they fire the gun? Yes. Was there intent to kill? I can't tell beyond a reasonable doubt."

Defendant's posttrial motion was denied and arguments in aggravation and mitigation were presented before sentencing. The trial court noted the nature of the offense and "great risk"

defendant puts citizens in, and opined that probation was inappropriate.  Defendant was

sentenced to concurrent terms of eight years' imprisonment for all three aggravated discharge of

a firearm convictions and three years' imprisonment for the AUUW convictions.

## II.  ANALYSIS

### A.  Aggravated Unlawful Use of a Weapon and the Second Amendment

Defendant argues that this court should declare the AUUW statute unconstitutional as

violating the second amendment and vacate his convictions under that statute.  The second

amendment states, in full, "A well regulated Militia, being necessary to the security of a free

State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const., amend.

II.  In his initial brief, defendant argued that the United States Supreme Court's decision in *Heller*

held that the second amendment provides the individual right to bear arms for self-defense and

this court should find that right a fundamental right applicable to the states through the fourteenth

amendment.  *District of Columbia v. Heller*, 554 U.S.__, __, __, 171 L. Ed. 2d 637, 661-62, 677,

128 S. Ct. 2783, 2801-02, 2815-16 (2008).  In *Heller*, the Supreme Court struck down a District

of Columbia ordinance which "totally ban[ned] handgun possession in the home.  It also

require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all

times, rendering it inoperable."  *Heller*,  554 U.S.__, 171 L. Ed. 2d at 679, 128 S. Ct. at 2817.

Following briefing and oral arguments in this case, the United States Supreme Court

issued its decision in *McDonald v. City of Chicago*, No. 08-1521 (U.S. June 28, 2010) (plurality

op.), in which it held that the right to possess a handgun in the home for the purpose of self-

defense is protected by the second amendment as a fundamental right.  The *McDonald* Court

continued on to hold that the due process clause of the fourteenth amendment incorporates the second amendment right as recognized in *Heller*. *McDonald*, slip op. at 44. In *McDonald*, the Supreme Court struck down a City of Chicago ordinance which prohibited any person within the city to possess any handgun unless the handgun had been registered by the owner with the city prior to March 30, 1982, and the handgun had to have trigger lock and load indicator devices. *McDonald* also struck down a similar Oak Park ordinance. We granted defendant's request to file a supplemental brief addressing *McDonald*. The State also filed a supplemental brief in response.

In his initial brief, defendant argued that the historical findings in *Heller* "shortened the reasoning needed to reach this conclusion to that of a mere syllogism." Defendant now maintains that with the holding in *McDonald*, this court must strike down the AUUW statute as an unconstitutional restriction on his fundamental right to bear arms. We begin review of such an argument with the presumption that the statute is constitutional. Because of this presumption, and the legislature's wide latitude in prescribing criminal penalties under the police power, the challenging party has the burden of proving the legislation fails to comply with due process requirements. *People v. Jones*, 223 Ill. 2d 569, 596 (2006). It is our duty, when it may be reasonably done, to construe a challenged statute in a manner that upholds its validity and constitutionality. *Jones*, 223 Ill. 2d at 595-96. Because constitutionality is a pure question of law, our standard of review is *de novo*. *Davis v. Brown*, 221 Ill. 2d 435, 443 (2006).

The AUUW statute under which defendant was convicted reads as follows:

"(a) A person commits the offense of aggravated unlawful use of a

weapon when he or she knowingly:

(1) Carries on or about his or her person or in any vehicle or concealed on or about his or her person except when on his or her land or in his or her abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm; ***

[and]

***

(3) One of the following factors is present:

(A) the firearm possessed was uncased, loaded and immediately accessible at the time of the offense[.]" 720 ILCS 5/24-1.6(a)(1), (a)(3)(A) (West 2006).[1]

Defendant maintains that, after *Heller* and *McDonald*, his challenge of the AUUW statute must be considered under strict scrutiny review because a fundamental right is at issue. *In re R.C.*, 195 Ill. 2d 291, 304 (2001). He argues that this court's prior ruling in *Wilson v. Cook County*, 394 Ill. App. 3d 534 (2009), that the holding in *Heller* does not apply to the states no longer applies. Despite the plurality opinion in *McDonald* and the holdings in both cases explicitly limiting the stated right to possession in the home, defendant contends that the *Heller*

---

[1] We note that in August 2009, subsequent to defendant's convictions, our legislature amended the AUUW statute, expanding the exceptions in subsections 24-1.6(a)(1) and (a)(2) to include in his or her "legal dwelling" and when he or she is "on the land or in the legal dwelling of another person as an invitee with that person's permission." Pub. Act 96--742, eff. August 25, 2009.

and *McDonald* Courts' extensive review of historical and state constitutional analogues indicate that the Supreme Court has announced not only that the second amendment right to bear arms is fundamental, but it extends to protect a citizen's ability to carry a handgun outside the home in case of confrontation. Therefore, he contends that this court no longer needs clarification of the second amendment right to find the AUUW statute unconstitutional because it criminalizes the act of bearing arms in self-defense.

The State counters that, as noted above, when reasonably possible, a court has the duty to uphold the constitutionality of a statute. *People v. Dinelli*, 217 Ill. 2d 387, 397 (2005). It argues that the AUUW statute has repeatedly withstood constitutional attacks. See, *e.g.*, *People v. Sole*, 357 Ill. App. 3d 988, 991 (2005); *People v. Austin*, 349 Ill. App. 3d 766 (2004); *People v. Marin*, 342 Ill. App. 3d 716 (2003); *People v. McGee*, 341 Ill. App. 3d 1029 (2003). The State maintains that, by its own terms, *Heller* does not affect these holdings. The State notes that *Heller* considered only whether a ban on the possession of usable handguns in a home was unconstitutional and, more importantly, explicitly rejected the opportunity to pronounce the right bestowed by the second amendment a fundamental right. It further notes that *McDonald* did not expand *Heller*'s definition of the right, but simply found that right to be fundamental and incorporated under the due process clause of the fourteenth amendment.

In *Wilson*, we highlighted the *Heller* Court's explicit reluctance to clarify the field in one case. We also noted that *Heller* clearly implied that the clock on the incorporation question was ticking loudly, however the second amendment right would eventually be defined. *Wilson*, 394 Ill. App. 3d at 539-40, citing *Heller*, 554 U.S. at__, 171 L. Ed. 2d at 683, 128 S. Ct. at 2821. In

refusing to find the right to be fundamental and strike down the Cook County assault gun ban, this court approvingly cited the opinion of the Seventh Circuit Court of Appeals in *National Rifle Ass'n of America, Inc. v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009) (*NRA*), in which it refused to declare the second amendment right to bear arms a fundamental right, holding steadfast to the long-established rule of allowing the Supreme Court the prerogative of overruling its own decisions and following directly controlling cases. *NRA*, 567 F.3d at 857-58. The appeal of *NRA* was renamed *McDonald* and, as noted above, the United States Supreme Court held that the second amendment protected a fundamental right and that the due process clause of the fourteenth amendment incorporates that right to apply to the states. We are now left with the responsibility of determining the scope of the right as announced by the *Heller* and *McDonald* Courts and whether the provisions of the AUUW statute violate that right.

Despite some 370 pages of slip opinion in these two cases, the Court deliberately and expressly maintained a controlled pace of essentially beginning to define this constitutional right. Again, it is essential to the resolution of this issue to understand that the *Heller* Court ultimately limited its holding to the question presented - that the second amendment right to bear arms protected the right to possess a commonly used firearm, a handgun, in the home for self-defense purposes. *Heller*, 554 U.S. at__, __, 171 L. Ed. 2d at 661-62, 677, 128 S. Ct. at 2801-02, 2815-16. *McDonald* also addressed the limited question of whether a ban on the possession of a handgun in the home violated the second amendment right to bear arms. The holding in *McDonald* was similarly constrained with a plurality of the Court concluding that the right to possess a handgun in the home for self-defense was fundamental and incorporated under the due

process clause. *McDonald*, slip op. at 44. While this deliberate pace leaves this court with a certain level of uncertainty, the current parameters of the right under the holdings of these cases and our mandate to construe statutes to be constitutional when possible leads to the conclusion that the AUUW statute is constitutional

The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of "bear arms" including wearing or carrying upon the person or in clothing. See *Heller*, 554 U.S. at__, 171 L. Ed. 2d at 652-53, 128 S. Ct. at 2793. Nor can the *Heller* majority's holding that the operative clause of the second amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation" require heightened review of the AUUW statute's criminalization of the carrying of an uncased and loaded firearm. See *Heller*, 554 U.S. at__, 171 L. Ed. 2d at 657, 128 S. Ct. at 2797. As addressed above, *Heller* specifically limited its ruling to interpreting the amendment's protection of the right to possess handguns in the home, not the right to possess handguns outside of the home in case of confrontation - a fact the dissent heartily pointed out by noting that "[n]o party or amicus urged this interpretation; the Court appears to have fashioned it out of whole cloth." *Heller*, 554 U.S. at__, 171 L. Ed. 2d at 690, 128 S. Ct. at 2828 (Stevens, J., dissenting, joined by Souter, Ginsburg and Breyer, JJ.). The *McDonald* Court refused to expand on this right, explaining that the holding in *Heller* that the second amendment protects "the right to possess a handgun in the home for the purpose of self-defense" was incorporated. *McDonald*, slip. op. at 44.

With this understanding of the right announced by the *Heller* and *McDonald* courts, we

consider the limited treatment of gun regulations in those opinions. The *McDonald* Court "repeat[ed] those assurances" from *Heller* that "the right to keep and bear arms is not 'a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose' and no doubt was to be cast on longstanding regulatory measures such as " 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' " *McDonald*, slip op. at 39-40, quoting *Heller*, 554 U.S. at___, 171 L. Ed. 2d at 678, 128 S. Ct. at 2816-17. As Justice Scalia highlights in his concurring opinion, it is clear that the right to bear arms, like most rights, is not unlimited but subject to some restrictions and, in fact, the scope of the right is defined in part by traditional restrictions of the right. *McDonald*, slip op. at 52 (Scalia, J., concurring). Justice Scalia concludes by noting the majority's approach grants power to people and the democratic process because "the rights it fails to acknowledge are left to be democratically adopted or rejected by the people, with the assurance that their decision is not subject to judicial revision." *McDonald*, slip op. at 52 (Scalia, J., concurring).

In his dissent, in a clear case of purposeful understatement, Justice Breyer commented that " 'only a few uncertainties that quickly come to mind' " when considering the issue of state and local regulations:

"Does the right to possess weapons for self-defense extend outside the home? To

the car? To work? What sort of guns are necessary for self-defense? Handguns?

Rifles? Semiautomatic weapons? When is a gun semi-automatic? Where are

different kinds of weapons likely needed? Does time-of-day matter? Does the presence of a child in the house matter? Does the presence of a convicted felon in the house matter? Do police need special rules permitting patdowns designed to find guns? When do registration requirements become severe to the point that they amount to an unconstitutional ban? Who can possess guns and of what kind? Aliens? Prior drug offenders? Prior alcohol abusers? How would the right interact with a state or local government's ability to take special measures during, say, national security emergencies?" *McDonald*, slip op. at 191-92 (Breyer, J., dissenting), quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S.__ , __ , 173 L. Ed. 2d 1208, 1231, 129 S. Ct. 2252, 2272 (2009) (Roberts, C.J., dissenting, joined by Scalia, Thomas and Alito, JJ.).

The infancy stages of defining a protected right is a challenging time for legislators, judges and law enforcement alike, but necessary to provide proper consideration. Despite this seemingly open road to future litigation, the *McDonald* majority reiterates the *Heller* majority's holding in clearly defining the protected right to be to keep and bear arms in the home for the purpose of self-defense. All of the Justices who wrote in *McDonald* make clear that there is a bevy of empirical evidence that must be considered in future litigation concerning this right and that many of the present day limitations and prohibitions on firearms will not only stand, but assist in defining the parameters of the second amendment right.

As addressed by the State, our appellate courts have undertaken constitutional review of the AUUW statute in a line of criminal cases and each time the statute has been found

constitutional. Our supreme court has denied appeals in these cases and not undertaken a review of the AUUW statute as it is currently written. Based on claims that the statute was overly broad or failed to require a mental state, the *Sole*, *Austin*, *Marin* and *McGee* courts upheld the constitutionality of the statute under the rational basis review standard.

Clearly, these cases were all decided prior to *Heller* and *McDonald*. However, as we have discussed, *Heller* and *McDonald* do not define the fundamental right to bear arms to include activity barred by the AUUW statute. Therefore, these opinions' discussion of the legislative purpose behind the statute and constitutional findings prevail here and we follow these holdings in rejecting defendant's claim. See *Sole*, 357 Ill. App. 3d at 991-92. The AUUW statute specifically excludes possession of a firearm in one's abode from its proscriptions, further defining that exclusion with the 2009 amendment to include one's "legal dwelling," and therefore does not implicate the fundamental right to keep and bear arms in one's home for self-defense. The statute simply restricts the public possession of a loaded and accessible firearm on one's person or in one's vehicle. Indeed, section 24-1.6(a)(1) makes it clear that the AUUW statute's proscriptions do not apply to a person "when on his or her land or in his or her abode or fixed place of business." 720 ILCS 5/24-1.6(a)(1) (West 2006). Accordingly, the legislature has not only protected the fundamental right at issue, but provided protection beyond that right and defendant's argument that the AUUW statute must be struck down as an unconstitutional restriction on second amendment rights by the State is rejected.

## B. Aggravated Discharge of a Firearm

First, as noted above, the State concedes that defendant's conviction of aggravated

discharge of a firearm under count III based on the shots fired at the vehicle in the alleyway must be vacated as it is based on the same act as alleged in count IV, aggravated discharge of a firearm at a person. Defendant also argues that the evidence was insufficient to convict him on the remaining charges of aggravated discharge of a firearm. We review a challenge to the sufficiency of the evidence by viewing the evidence in a light most favorable to the prosecution to determine if any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. De Filippo*, 235 Ill. 2d 377, 384-85 (2009).

Defendant concedes that the testimony of a single witness may be sufficient to convict a defendant, but asserts that testimony must be positive and the witness must be credible. He further notes that credibility determinations are the province of the trier of fact and entitled to great weight, but are not conclusive. *People v. Smith*, 185 Ill. 2d 532, 541-42 (1999). The *Smith* court continued to state that a conviction will be reversed "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 542. Defendant adds that this standard also applies to the decision whether to find disavowed testimony credible over trial testimony. *People v. Brown*, 303 Ill. App. 3d 949, 964 (1999). Defendant argues that this court's decisions in *People v. Arcos*, 282 Ill. App. 3d 870 (1996), and *People v. Reyes*, 265 Ill. App. 3d 985 (1993), support reversal.

In *Arcos*, the key evidence was a written statement and grand jury testimony of an eyewitness submitted as substantive evidence that the defendant had murdered the victim. At trial, the witness disavowed his statement and grand jury testimony, claiming that he was under the influence of narcotics when he made the statement, that he feared for his life, and that he

wanted to avoid incarceration with gangmembers who wanted to kill him. *Arcos*, 282 Ill. App. 3d at 873. The trial court found the witness had absolutely no credibility, but found his statement to the police to be true. It opined that it would be easier for the witness to tell the police something he knew rather than make it up and that corroborating evidence supported the statement. *Arcos*, 282 Ill. App. 3d at 874-75. This court found the corroborating evidence lacked relevance and was insufficient to support admission of the statement as substantive evidence because it shed no light on who committed the crime. *Arcos*, 282 Ill. App. 3d at 875-76.

In *Reyes*, the defendant was found guilty of attempted murder and aggravated battery under an accountability theory as part of a group that beat the victim. Two witnesses for the State testified to the grand jury that, from a vehicle approximately 30 feet away from the fight, they saw the defendant kicking the victim. However, at trial, the witnesses testified that they could not remember seeing the defendant take part in the beating or how long he was at the scene as it was a general melee with people coming and going. One of the witnesses also testified that she had consumed 15 beers at a party before witnessing the beating. *Reyes*, 265 Ill. App. 3d at 986-87. The appellate court found the State's evidence unsatisfactory and that it failed to prove that the defendant was one of the group that beat the victim. The court found the grand jury testimony that both witnesses disavowed was simply a one-word response to the prosecutor's leading question and the only corroborating evidence simply placed the defendant at the scene. Therefore, the convictions were reversed for the State's failure of proof beyond a reasonable doubt. *Reyes*, 265 Ill. App. 3d at 989-91.

Defendant asserts that Brantley is a four-time felon who gave the police a self-serving

statement and the conditions at the times of the shootings discount his identifications as well. Not only did Brantley admit that he was a little intoxicated, but it was dark outside with limited lighting to provide any visibility. Accordingly, defendant contends that Brantley is not the type of witness who could provide credible evidence to sustain a conviction and the corroborating evidence is insufficient to support the trial court's acceptance of Brantley's disavowed statements.

We agree with the State that the trial court's credibility determination was not in error and the use of Brantley's prior testimony and statement as substantive evidence was proper. Despite Brantley's obvious imperfections as a witness, his prior testimony and statements comport with the physical evidence, testimony and circumstantial evidence presented at trial. At trial, Brantley denied seeing who shot at him, who drove the light blue Oldsmobile in the alley or who shot at him in the second shooting. Brantley's disavowed statements identified defendant as the driver of the car and as a shooter in both incidents.

In this case, there is ample corroborating evidence to support the trial court's conclusion. Unlike in *Reyes*, in this case, Officer Rosales identified defendant as one of the shooters in the second shooting and corroborated much of Brantley's disavowed testimony as to that event. Further, physical evidence linked both shootings to the handguns, shell casings and bullets that were found at the scene of the second shooting, in the light blue Oldsmobile and in Brantley's vehicle. Further, defendant was positively identified as one of the men holding a gun at the second shooting and discarding the guns through the window. This corroborating evidence provided direct support and circumstantial evidence sufficient to support Brantley's disavowed

No. 1-08-2106

statement.

Further, as the State argues, for aggravated discharge of a firearm at a person it need only prove that defendant discharged his firearm in the direction of Brantley. 720 ILCS 5/24-1.2(a)(2) (West 2006); *People v. James*, 246 Ill. App. 3d 939, 944-45 (1993). Defendant argues that the evidence, at best, shows that defendant was not shooting at the direction of Brantley but away from him, and thus, he could not be guilty of the crime as charged. Based on the evidence, we cannot find that the trier of fact erred in determining that defendant fired the shots in the direction of Brantley. Accordingly, taken as a whole and in a light favorable to the prosecution, no reasonable doubt was raised and the trial court's determinations as to the aggravated discharge of a weapon convictions were proper.

C. Aggravated Unlawful Use of a Weapon

The State also concedes that count VII, one of defendant's convictions for AUUW, must be vacated because there was no evidence to conclude whether defendant had any ownership rights to the property where the second shooting occurred. Defendant argues that the remaining AUUW conviction of count VIII for carrying the firearm loaded, uncased and accessible in an automobile must be reversed. Defendant asserts that this charge is a lesser included offense of the unlawful discharge of a firearm convictions and must fail under the one act, one-crime rule. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004). Defendant argues that the charging instrument describes the charges as lesser included offenses and is not sufficiently detailed to allow the State to apportion charges on appeal. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001).

We agree with the State that the circumstantial evidence produced at trial supports the

conviction for AUUW for its transport from the first shooting to the residence. This was a distinct act from the discharge of the weapon. The physical evidence and testimony linked defendant to the handgun that was used in the first shooting and its disposal after the second shooting. Shell casings and bullet fragments linked to the Bersa .380 that defendant was seen throwing out the window of the house were discovered at the scene of the first shooting. As addressed above, the trial court properly determined that the record supported the finding that defendant was involved in the first shooting.

When a charging instrument is attacked for the first time on appeal it need only be specific enough to allow preparation of a defense and allow pleading a resulting conviction as a bar to future prosecution arising from the same conduct. *People v. DiLorenzo*, 169 Ill. 2d 318, 322 (1996). The charging instrument provided the date and allegation that defendant was in a vehicle, not on his own land, and had an uncased, loaded and accessible firearm. The parties discussed each charge prior to trial and the trial court again discussed this particular charge with respect to defendant's motion for directed verdict. While circumstantial, we agree that there can be no other conclusion that the evidence showed that defendant had this handgun in his vehicle both before and after the first shooting. As defendant admits, because he fired the handgun from his vehicle in the first shooting, it ostensibly was uncased, loaded and accessible and meets the elements of the crime. See 720 ILCS 5/24-1.6(a) (West 2006). The trial court correctly found defendant guilty of AUUW under count VIII.

## D. Sentencing

Finally, defendant argues that, if his charges are not reversed, this matter must be

remanded for another sentencing hearing because several charges will be vacated. Defendant asserts that where the appellate court cannot say that the trial court did not consider vacated convictions in imposing a sentence, remand is required. *People v. Alejos*, 97 Ill. 2d 502, 513-14 (1983); *People v. Johnson*, 314 Ill. App. 3d 444, 451 (2000). Defendant claims that the trial court's reference to all convictions as "the offense" and the identical sentences on each of the aggravated discharge of a weapon counts makes it clear that the trial court considered the charges as a group and not independently. *People v. Morrison*, 137 Ill. App. 3d 171, 178 (1985).

Defendant's cited cases do not require remand. In *Alejos*, the matter was remanded for resentencing because the trial court "obviously, but mistakenly" determined that the defendant's use of a handgun merited an enhanced punishment for his sentence for voluntary manslaughter. *Alejos*, 97 Ill. 2d at 514. In *Johnson*, the court indicated that the defendant was convicted of " 'two very serious charges' " and did not otherwise negate consideration of the vacated charge. *Johnson*, 314 Ill. App. 3d at 451. In *Morrison*, six of defendant's seven convictions for home invasion were vacated while his six convictions for attempted armed robbery were affirmed. Defendant's sentences for the attempted armed robbery convictions were also affirmed because there was no evidence they were influenced by the home invasion conviction, but remanded for resentencing on the home invasion conviction because the total number of counts may have influenced the trial court's decision. *Morrison*, 137 Ill. App. 3d at 178.

In this case, the trial court sentenced defendant to terms within the sentencing range without any consideration of improper factors like in *Alejos*. In doing so, the court noted the nature of the offense and the "great risk" defendant put citizens in by firing a handgun in an

alleyway and toward a street, and because of this, the court found that probation was improper under such evidence. The record does not show any evidence that the trial court was persuaded by the number of counts or convictions as in *Johnson* and *Morrison*, but that the concern was defendant's actions in multiple shootings. Accordingly, defendant's sentences are affirmed.

### III. CONCLUSION

For the foregoing reasons, the $5 court system fee imposed pursuant to section 5-1101(a) and defendant's convictions under counts III and VII are vacated. Defendant's remaining convictions and sentence are affirmed.

Affirmed in part and vacated in part.

QUINN and STEELE, JJ., concur.

No. 1-08-2106

Please Use
Following
Form:

Complete
TITLE
of Case

# THE PEOPLE OF THE STATE OF ILLINOIS,

**Plaintiff-Appellee,**

**v.**

# CHRISTOPHER DAWSON,

**Defendant-Appellant.**

Docket No.

**Nos. 1-08-2106**

COURT

**Appellate Court of Illinois**
**First District, THIRD Division**

Opinion Filed

**August 18, 2010**

JUSTICES

**PRESIDING JUSTICE MURPHY delivered the opinion of the court:**

**Quinn and Steele, JJ.,** concur [s]

APPEAL from
the Circuit Ct. of
Cook County,
Criminal Div.

**Lower Court and Trial Judge(s) in form indicated in the margin:**

**The Honorable** **Joseph M. Claps** **, Judge Presiding.**

For
APPELLANTS,
John Doe, of
Chicago.

**Indicate if attorney represents APPELLANTS or APPELLEES and include**
**attorneys of counsel. Indicate the word NONE if not represented.**

**Attorneys for Petitioner-Appellant:** **Michael J. Pelletier, State Appellate Defender**
**Patricia Unsinn, Deputy Defender**
**Jonathan Yeasting, Asst. Appellate Defender**
**203 N. LaSalle Street, 24th Floor**
**Chicago, IL 60601**
**Phone: (312) 814-5472**

**Attorneys for Respondent-Appellee:** **Anita Alvarez, State's Attorney of Cook County**
**Of counsel: Alan S. Spellberg, Mary Needham, William L.**
**Toffenetti, Asst. State's Attorneys**
**309 Richard J. Daley Center**
**Chicago, IL 60602**
**Phone: (312) 603-3362**

For
APPELLEES,
Smith and Smith
of Chicago,
Joseph Brown,
(of Counsel)

-24-