SIXTH DIVISION
March 11, 2011

No. 1-09-1463

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 09 CR 3228 |
| | ) | |
| JERMAINE ROSS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ROBERT E. GORDON delivered the judgment of the court, with opinion.
Justices Cahill and McBride concurred in the judgment and opinion.

**OPINION**

Defendant Jermaine Ross was found guilty after a bench trial of aggravated unlawful use of a weapon and of being an armed habitual criminal. He was sentenced to 80 months in the Illinois Department of Corrections on the armed habitual criminal count only; no sentence was imposed for the aggravated unlawful use of a weapon count. 720 ILCS 5/24-1.7 (West 2008). After his posttrial motion was denied, defendant filed this appeal and argues: (1) that the State failed to prove beyond a reasonable doubt that defendant had knowledge of the firearms found behind the driver's seat of an automobile that he did not own; (2) that the armed habitual criminal statute violates federal and state constitutional guarantees of the right to bear arms; and (3) that the statute violates the *ex post facto* clauses of both the federal and state constitutions since the predicate prior convictions occurred before the effective date of the legislation that created the offense. For the following reasons, we are not persuaded by defendant's claims, and we affirm his conviction.

BACKGROUND

I. State's Case In Chief

The facts of this case are highly disputed. Police officer Conray Jones, a 16-year veteran of the Chicago police department, testified that he was with his partner Officer Seaberry in a marked police vehicle when he observed Sylvester Tatum walking toward a vehicle stopped along the curb on West End Avenue near Central Avenue. The police vehicle was 20 to 30 feet from the rear of defendant's vehicle when he heard Tatum say "rocks and blows" to defendant, who was stopped with his vehicle running, window opened, sitting in the driver's side of the vehicle with no passengers. The officer knew that "rocks and blows" was street talk for cocaine and heroin. When Tatum noticed the police vehicle, he walked away from the parked auto. Defendant then exited the vehicle, leaving the auto running. The officers detained defendant and Tatum. Officer Seaberry walked to the stopped vehicle and returned with a .40-caliber handgun with 10 live rounds. The officers then placed defendant under arrest.

Officer Jones's partner, Officer Seaberry, also testified that he heard Tatum say something like "rocks and blows" as they eased behind defendant's vehicle. Officer Seaberry's testimony corroborated the testimony of Officer Jones. After the police detained Tatum and defendant, Officer Seaberry walked over to defendant's vehicle, which was still running. While standing outside the vehicle, he observed the butt of a gun on the floor of the backseat, behind the driver's side, next to and partially under a black bag. Officer Seaberry testified that he made this observation from outside the vehicle when the back door was closed. After the State presented certified copies of defendant's convictions for delivery of a controlled substance, it rested its case.

## II. Defense Case

The defense called Elizabeth Gomez, defendant's girlfriend, who testified that the vehicle belonged to her. On the morning of defendant's arrest, defendant dropped her off at work at about 9:50 a.m. and at that point in time the only item in the backseat of her vehicle was an infant car seat.

Defendant also testified on his own behalf. Defendant testified that when he drove Gomez's vehicle, the only item in the backseat was the infant car seat and he denied having a gun in his possession. Defendant testified that, after he dropped off Gomez, he picked up his friend, Tyrone Patterson, and then he observed his teenage son, Jamal, on Central Avenue. Defendant stopped and told Jamal that he would be stopping a block away.

When defendant turned onto West End Avenue, he observed Tatum and another friend. Defendant stopped and parked the vehicle and walked across the street to talk to Tatum. Then, an unmarked police vehicle arrived, and a detective told defendant to move his vehicle because it was parked illegally. The unmarked police vehicle then left the area. Defendant then asked his friend Patterson to move the vehicle, and defendant's son Jamal approached. Then, the marked police vehicle arrived with Officers Jones and Seaberry.

Patterson also testified for the defense and corroborated most of defendant's testimony. However, he testified that, after he exited the vehicle after parking it, he was walking toward defendant when Jamal arrived. He observed Jamal walk toward the vehicle, open the back door and place a gun under the seat. As Patterson began to tell defendant what Jamal had done, the police arrived and detained everyone, which included defendant, Tatum, Patterson, and Jamal.

Patterson had three prior felony convictions and was on parole at the time of the trial.

The defense also introduced 43 seconds of a security camera footage that showed only Officer Seaberry walking to the backseat of the parked vehicle. Defendant testified that the video showed that the vehicle was not running.

### III. State's Rebuttal Case

In the State's rebuttal case, Officer Jones testified that there were no people in the area other than defendant and Tatum.

As noted, defendant was found guilty of aggravated unlawful use of a weapon and of being an armed habitual criminal. He was sentenced to 80 months on the armed habitual criminal count; and no sentence was given for the aggravated unlawful use of a weapon count.

### ANALYSIS

### I. Sufficiency of the Evidence

Defendant first claims that the State failed to prove him guilty beyond a reasonable doubt of being an armed habitual criminal. Defendant claims that he was not the owner of the vehicle and that the handgun was behind the driver's seat and out of his view.

### A. Standard of Review

When reviewing the sufficiency of the evidence in a criminal case, we must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Defendant claims that our standard of review is *de novo* as the question is purely legal. *In re Ryan B.*, 212 Ill.

2d 226, 231 (2004) (where defendant's challenge to the sufficiency of the evidence "does not question the credibility of the witnesses, but instead questions whether the uncontested facts were sufficient" to convict, "review is *de novo*"); *People v. Smith*, 191 Ill. 2d 408, 411 (2000) . However, defendant is actually asking this court to review the trial court's factual findings, based on the conflicting testimony between the police officers and the defense witnesses. As a result, this court must review the evidence in the light most favorable to the State. *People v. Pryor*, 372 Ill. App. 3d 422 (2007). Thus, the issue presented is a question of fact and not of law, and the standard of review is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

"[A] reviewing court will not reverse a criminal conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *People v. Rowell*, 229 Ill. 2d 82, 98 (2008). A reviewing court does not retry the defendant or substitute its judgment for that of the trier of fact with regard to the credibility of witnesses or the weight to be given to each witness's testimony. *People v. Jackson*, 232 Ill. 2d 246, 281 (2009); *People v. Ross*, 229 Ill. 2d 255, 272 (2008).

B. Evidence

A person commits the offense of being an armed habitual criminal if he "receives, sells, possesses, or transfers any firearm" after having been convicted of at least two triggering offenses. 720 ILCS 5/24-1.7 (West 2008). To establish guilt on a theory of constructive possession of a firearm, the State must prove: (1) that defendant had knowledge of the presence

of the weapon; and (2) that defendant exercised immediate and exclusive control over the area when the weapon was found. *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003); *People v. Bailey*, 333 Ill. App. 3d 888, 891 (2002). A trier of fact is entitled to rely on reasonable inferences of knowledge and possession. *Smith*, 191 Ill. 2d at 413.

The evidence introduced by both the State and the defense showed that only defendant was in possession of the vehicle when the handgun was found. Gomez, a defense witness, testified that defendant was the permissive user of the vehicle after defendant dropped Gomez off at work, and there was no gun or anything other than an infant seat in the backseat of the vehicle at that point in time. The reasonable inference from Gomez's testimony is that the black bag, as well as the gun, must have been placed in the backseat, after Gomez exited the vehicle.

The police testified that they observed no other people enter or exit the vehicle. However, defendant presented two witnesses who claimed they entered and exited the vehicle after Gomez exited. One of those witnesses, Patterson, testified that he observed defendant's teenage son place the gun in the backseat. However, Officer Jones testified on rebuttal that there were no people in the area other than defendant and Tatum. There is no testimony that placed Patterson in the vehicle, other than the testimony of defendant and Patterson, and no testimony from defendant that his son entered the vehicle. Jamal, defendant's teenage son, did not testify.

Also, defendant's conduct in leaving the vehicle would support a reasonable inference that he had knowledge of the presence of the handgun. The undisputed testimony shows that, when Tatum noticed that a police vehicle was approaching, he began to walk away from the vehicle. Defendant also proceeded to leave the vehicle and walk away. Knowledge may be proven by

6

evidence of a defendant's acts, declarations or conduct from which it can be inferred he knew the contraband existed in the place where it was found. *People v. Beverly*, 278 Ill. App. 3d 794, 798 (1996).

Defendant relies on *People v. Bailey*, 333 Ill. App. 3d 888 (2002), as authority that knowledge of contraband is not presumed merely on the basis of defendant's proximity to the contraband. In *Bailey*, the defendant was a passenger in a vehicle where the gun was found under the passenger's seat. In *Bailey*, the vehicle was driven by another person, and the gun was hidden from view. By contrast, knowledge of the gun in the case at bar was not presumed merely on the basis of defendant's proximity to the gun. Knowledge was presumed based on: (1) the control and possession of the vehicle given by defendant's girlfriend to defendant; (2) his abandonment of the vehicle as the police officers approached; and (3) one officer's observation of the butt of the gun on the floor of the backseat of the vehicle.

Defendant also relies on *People v. Hampton*, 358 Ill. App. 3d 1029 (2005), where a hidden gun was found in a tube sock in an unlocked glove compartment. *Hampton*, 358 Ill. App. 3d at 1030. In *Hampton*, the court stated that, for an inference of knowledge to arise, the State has to demonstrate that defendant "had regular, on-going control over the vehicle he was driving." First, in the *Hampton* case, the auto was registered to another person, and the State did not show a relationship between Hampton and the registered owner. Second, the gun in the *Hampton* case was hidden from view. By contrast, in this case, there was a relationship between the defendant and the owner of the vehicle and the handgun was in plain view.

*People v. Ingram*, 389 Ill. App. 3d 897 (2009), cited by the State, is analogous to this

7

case. In *Ingram*, the police officers noticed a vehicle that was parked in a grocery store parking lot quickly pull out of a parking stall, turn abruptly, and then park at the other end of the parking lot. The police ran the vehicle's license plate and discovered that its registration had expired. Ingram was in the front passenger seat; another person was in the backseat, and a third person was driving. When the police approached the vehicle, Ingram immediately exited the vehicle and started to walk away from the area. When the police looked inside the auto, they observed a handgun on the floor of the backseat, directly behind the driver's seat. A jury convicted Ingram of unlawful possession of a weapon by a felon. We affirmed defendant's conviction because: (1) the handgun was in plain view on the floor of the auto; (2) Ingram had been in the auto for a sufficient period of time to imply knowledge; (3) the handgun was in a position where Ingram easily could have reached over and placed it on the floor of the backseat; and (4) most importantly, Ingram's flight from the auto supported the reasonable inference that he possessed the gun.

Here, the gun was in plain view, and the owner of the auto testified that at 9:50 a.m. there was only an infant seat in the backseat. At 10:45 a.m., the police found a black bag and a handgun in the backseat, and defendant had possession and control of the vehicle during this period of time. Defendant's conduct in leaving the vehicle provides a reasonable inference of flight to avoid the police and further supports a reasonable inference that defendant possessed the gun. Viewing the evidence in the light most favorable to the State, we cannot say that a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt.

II. The Armed Habitual Criminal Statute and the Right to Bear Arms

Defendant argues that this court should declare the armed habitual criminal statute unconstitutional as a violation of the second amendment and vacate his conviction under that statute. The second amendment states, in full:

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend II.

In his initial brief, defendant argued that the second amendment protects an individual's "inherent" natural right to keep a firearm for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 598-99 (2008).

In *Heller*, the United States Supreme Court struck down a District of Columbia ordinance which "totally ban[ned] handgun possession in the home. It also require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable." *Heller*, 554 U.S. at 628.

Prior to defendant's reply brief, the United States Supreme Court issued its decision in *McDonald v. City of Chicago*, 561 U.S. __, 130 S. Ct. 3020 (2010), in which it found that the right to possess a handgun in the home for the purpose of self-defense is protected by the second amendment as a fundamental right, and that the due process clause of the fourteenth amendment incorporates the second amendment. *McDonald*, 561 U.S. at __; 130 S. Ct. at 3050. Our United States Supreme Court struck down a Chicago ordinance prohibiting the possession of any handgun within the city, unless that handgun had a trigger lock and load indicator and had been

registered by the owner prior to March 30, 1982.[1]

Defendant maintains that both *Heller* and *McDonald* are instructive to show: that the armed habitual criminal statute is "unconstitutional on its face"; and that since the "fourteenth amendment requires that the fundamental, inherent right to bear arms be respected by the States," we must vacate defendant's conviction.

Although defendant did not raise this argument in the trial court, a constitutional challenge to a statute may be raised at any time. *People v. Bryant*, 128 Ill. 2d 448, 454 (1989). A statute's constitutionality is reviewed de novo. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009).

Various federal courts of appeal have adopted intermediate scrutiny as the proper standard of review to apply to second amendment challenges. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), the Third Circuit held "the Second Amendment can trigger more than one particular standard of scrutiny," depending upon the type of law challenged and the type of restriction placed upon the second amendment. *Marzzarella*, 614 F.3d at 97. The specific statute at issue in *Marzzarella* forbade possession of firearms with obliterated serial numbers (18 U.S.C. §922(k) (2006)). The Third Circuit noted that the statute "[did] not severely limit the possession of firearms," unlike the ban in *Heller*. *Marzzarella*, 614 F.3d at 97. The Third Circuit framed the intermediate scrutiny inquiry as whether the challenged law served a "significant," "substantial," or "important" government interest, and, if so, whether the "fit between the challenged [law] and

---

[1] *McDonald* also struck down a similar Oak Park ordinance.

the asserted objection [was] reasonable, not perfect." *Marzzarella*, 614 F.3d at 98. The Thurd Circuit upheld section 922(k).

In *United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010), the Seventh Circuit sitting *en banc* considered whether 18 U.S.C. §922(g)(9) (2006), which prohibits any person "who has been convicted in any court of a misdemeanor crime of domestic violence" from possessing firearms, violated the second amendment. The Seventh Circuit concluded that section 922(g)(9) was subject to intermediate scrutiny inquiry which turned on whether the statute was "substantially related to an important governmental objective." *Skoien*, 614 F.3d at 641. The Seventh Circuit upheld section 922(g)(9).

Recently, the Seventh Circuit applied intermediate scrutiny in two more cases: *United States v. Williams*, 616 F.3d 685 (7th Cir. 2010), upholding a statute barring felons from possessing firearms (18 U.S.C. §922(g)(1) (2006)); and *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), upholding a statute barring narcotics addicts from possessing firearms (18 U.S.C. §922(g)(3) (2006)). In *Yancey*, the Seventh Circuit "reserve[d] the question of whether a different kind of firearm regulation might require a different approach." *Yancey*, 621 F.3d at 683.

In *United States v. Chester*, 628 F.3d 673 (4th Cir. 2010), the Fourth Circuit Court of Appeals applied intermediate scrutiny and upheld 18 U.S.C. §922(g)(9), relying on *Marzzarella*. In *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010), the Tenth Circuit Court of Appeals upheld 18 U.S.C. §922(g)(8) (2006), which bars persons who are subject to domestic violence orders of protection from possessing firearms. In doing so, the Tenth Circuit relied upon both *Marzzarella* and *Skoien* in applying intermediate scrutiny.

11

Recently, this district in *People v. Aguilar*, No. 1-09-0840, slip op. at 16 (Ill. App. Feb. 23, 2011), applied the intermediate scrutiny standard in upholding the constitutionality of the aggravated unlawful use of a weapon statute and we also find it to be the appropriate standard in the present case.

We begin our analysis with the presumption that the statute is constitutional and that a party challenging a statute has the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). The legislature has a wide latitude in prescribing criminal penalties under its police power and has an obligation to protect its citizens from known criminals. As a result, the challenging party has the burden of proving that the statute fails to comply with due process requirements. *People v. Jones*, 223 Ill. 2d 569, 596 (2006).

Defendant's argument, from a maze of quotations from *Heller* and *McDonald*, is that a citizen who has committed at least two "triggered" felonies is denied his due process rights when he possesses a firearm in an automobile for self-defense. Our United States Supreme Court has never indicated that a felon can possess a firearm in a home or outside of a home. In fact, the majority in *Heller* stated that "nothing in our opinion should be taken to cast doubt on long-standing prohibitions on the possession of firearms *by felons* and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and governmental buildings, or laws imposing conditions on the commercial sale of arms." (Emphasis added.) *Heller*, 554 U.S. at 626-27.

*Heller* applies only to the question presented – that the second amendment right to bear arms protected the right to possess a handgun in the home for self-defense purposes. *Heller*, 554

U.S. at 598-99 (Breyer, J., dissenting, joined by Stevens, Souter, and Ginsberg, JJ.). *McDonald* also addressed the limited question of whether a ban on the possession of a handgun in the home violated the second amendment right to bear arms. The holding in *McDonald* was similarly constrained, with a plurality of the Court concluding that the right to possess a handgun in the home for self-defense was fundamental and incorporated under the due process clause of the fourteenth amendment. *McDonald*, 561 U.S. at __, 130 S. Ct. at 3050.

Defendant concedes that there are laws that have been found constitutional that forbid ex-felons from possessing firearms. However, defendant argues that those laws do not apply to ex-felons who keep arms for self-defense and that the United States Constitution does not expressly prohibit ex-felons from possessing a handgun, as it does in regard to an ex-felon's right to vote. U.S. Const., amend XIV, § 2. According to defendant, if the Constitution does not expressly say so, a right exists to all citizens. However, the courts have the role of interpreting the Constitution. "We follow [the United States Supreme] [C]ourt's rulings as the final arbiter of the United States Constitution." *Morissette v. Briley*, 326 Ill. App. 3d 590, 593 (2001) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803)). The United States Supreme Court has found laws limiting ex-felons from possessing firearms constitutional and logic tells us that it is good sense to have such laws.

This court in *People v. Dawson*, 403 Ill. App. 3d 499 (2010), recently found that a similar statute, the aggravated unlawful use of a weapon (AUUW) statute, was constitutional, even after the recent decisions in *Heller* and *McDonald*. This court in *Dawson* followed *McDonald*, as we must, stating:

"The *McDonald* Court 'repeat[ed] those assurances' from *Heller* that 'the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose" ' and no doubt was to be cast on longstanding regulatory measures such as ' "prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." ' *McDonald*, 561 U.S. at ___, 177 L. Ed. 2d at 926, 130 S. Ct. at 3047, quoting *Heller*, 554 U.S. at [625-26], 171 L. Ed 2d at 678; 128 S. Ct. at 2816-17. As Justice Scalia highlights in his concurring opinion, it is clear that the right to bear arms, like most rights, is not unlimited but subject to some restrictions and, in fact, the scope of the right is defined in part by traditional restrictions of the right. *McDonald*, 561 U.S. at ___, 177 L. Ed. 2d at 938, 130 S. Ct. at 3058 (Scalia, J., concurring). Justice Scalia concludes by noting the majority's approach grants power to people and the democratic process because 'the rights it fails to acknowledge are left to be democratically adopted or rejected by the people, with the assurance that their decision is not subject to judicial revision.' *McDonald*, 561 U.S. at ___, 177 L. Ed. 2d at 938, 130 S. Ct. at 3058 (Scalia, J., concurring)." *People v. Dawson*, 403 Ill. App. 3d at 509.

At oral arguments and later by motion, defendant cited *People v. Aguilar*, another constitutional challenge to the aggravated unlawful use of a weapon statute. *Aguilar*, slip op. at

10. Defendant makes specific reference to the dissent; however, we follow the majority opinion, which followed *Dawson* and *People v. Williams*, 405 Ill. App. 3d 958 (2010), where the Fourth Division of the First District affirmed the defendant's aggravated unlawful use of a weapon conviction based on carrying a pistol in his pocket as the defendant walked down a street. *Williams*, 405 Ill. App. 3d at 959.. *Aguilar* affirmed a defendant's aggravated unlawful use of a weapon conviction when he was under 18 years of age and possessed a loaded, concealed handgun while he was in the backyard of a friend's home. *Aguilar*, slip op. at 1.

This court in *Dawson* held that "the specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of 'bear arms' including wearing or carrying upon the person or in clothing." *Dawson*, 403 Ill. App. 3d at 508.

Defendant in this case points to the same language in *Heller* to support his argument that the natural meaning of "bear arms" contemplates a right protecting the carrying of firearms beyond the home. However, this court rejected that same contention in *Dawson* by stating:

> "*Heller* specifically limited its ruling to interpreting the amendment's protection of
> the right to possess handguns in the home, not the right to possess handguns
> outside of the home in case of confrontation-a fact the dissent heartily pointed out
> by noting that '[n]o party or *amicus* urged this interpretation; the Court appears to
> have fashioned it out of whole cloth.' *Heller*, 554 U.S. at 646, 171 L. Ed. 2d at
> 1090, 128 S. Ct. at 2828 (Stevens, J., dissenting, joined by Souter, Ginsburg and
> Breyer, JJ.)." *People v. Dawson*, 403 Ill. App. 3d at 508.

15

The Court in *Heller* also made it explicit that certain classes of people may be disqualified from the exercise of second amendment rights when it stated:

> "In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense. *Assuming that Heller is not disqualified from the exercise of Second Amendment rights*, the District must permit him to register his handgun and must issue him a license to carry it in the home." (Emphasis added). *Heller*, 554 U.S. at 635.

The United States Supreme Court in *McDonald* recognized that federal and state legislatures and local governments have police powers to pass laws that promote the health, safety, and general welfare of their citizens and that the police power includes the power to regulate certain aspects of gun possession and ownership. The Court stated:

> "We made in clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as '*prohibitions on the possession of firearms by felons* and the mentally ill,' *** 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.' [*Heller*, 554 U.S. at 646]. We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." (Emphasis added.) *McDonald*, 561 U.S. at ___, 130 S. Ct. at 3047.

It is deeply rooted in our jurisprudence that the government inherently possesses

and may lawfully exercise "such power of restraint upon private rights as may be found to be necessary and appropriate to promote the health, comfort, safety and welfare of society and may enact prohibitions to promote the general welfare even though the prohibition invade the right of liberty or property of an individual." (Internal quotation marks omitted). *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 310 (2008) (quoting *Booth v. People*, 186 Ill. 43, 48-49 (1900)).

In conclusion, we find that the armed habitual criminal statute is a constitutionally permissible restriction of the second amendment right to bear arms, as a valid exercise of government's right to protect the health, safety, and general welfare of its citizens. The restriction serves a substantial governmental interest and is proportional to the interest served.

III.  The Armed Habitual Criminal Statute and the *Ex Poste Facto* Clause

On August 2, 2005, the armed habitual criminal statute became effective and created the offense of an armed habitual criminal:

"A person commits the offense of being an armed habitual criminal if he or she receives, sells or possesses or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:

(1) a forcible felony defined in Section 2-8 of this Code;

(2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child; intimidation; aggravated intimidation; gunrunning; home invasion; or aggravated battery

17

with a firearm; or

(3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher." 720 ILCS 5/24-1.7(a) (West 2008).

The elements of the offense are as follows: (1) possession of a firearm; and (2) at least two prior convictions for certain enumerated offenses. The statute does not require that the prior offenses occurred after the effective date of the statute.

Illinois is prohibited from passing an *ex post facto* law by its own constitution and the Constitution of the United States. U.S. Const., art. I, §§ 9, 10; Ill. Const. 1970, art. I, § 16. An *ex post facto* law is one which punishes prior acts that were not criminal when they were accomplished. To establish an *ex post facto* violation, the defendant must show that the law in question was applied to events that occurred before its enactment and disadvantaged the defendant "by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997).

Defendant argues that his possession of a firearm occurred after August 2, 2005; that all of his prior convictions occurred prior to August 2, 2005; and that since all the elements of the offense did not occur after the effective date of the statute, his conviction violated the *ex post facto* clause. The State argues that the statute did not violate the *ex post facto* clause since defendant is being charged for a new and separate crime, and not for the earlier offense committed before the statute was enacted. We agree with the State.

Both the United States and Illinois Constitutions prohibit *ex post facto* laws. U.S. Const.,

art. I, §§ 9, 10; Ill. Const. 1970, art. I, § 16. An *ex post facto* law is one that: (1) makes criminal and punishable an act innocent when done; (2) aggravates a crime or makes it greater than when it was committed; (3) increases the punishment for a crime and applies the increase to crimes committed before the enactment of the law; or (4) alters the rules of evidence to require less or different evidence than required when the crime was committed. *People v. Leonard*, 391 Ill. App. 3d 926, 931 (2009). The prohibition against *ex post facto* laws is founded on the basis of a person's right to have fair warning of conduct giving rise to criminal penalties and punishment. See *People v. Coleman*, 111 Ill. 2d 87, 93-94 (1986).

Again, we begin our analysis with the presumption that the statute is constitutional and a party challenging a statute has the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). A statute's constitutionality is reviewed *de novo*. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009).

Defendant's arguments regarding the armed habitual criminal statute and its claimed violation of *ex post facto* laws were recently raised in the Third District case of *People v. Leonard*, 391 Ill. App. 3d 926 (2009), and in the First District case of *People v. Bailey*, 396 Ill. App. 3d 459 (2009).

In *Leonard*, which is analogous to this case, the defendant was convicted as an armed habitual criminal upon possessing a firearm and having had been convicted previously of three qualifying offenses between 1998 and 2004. Like this case, the defendant's prior convictions were used as an element of the offense, even though they occurred before the offense was enacted. The *Leonard* court found that the statute does not constitute *ex post facto* legislation.

After examining the statute, the *Leonard* court explained that it did not punish the defendant for offenses he committed before it was enacted but, instead, punished him for the separate offense of possessing a firearm *after* having been convicted of three of the statute's enumerated offenses. *Leonard*, 391 Ill. App. 3d at 931. The *Leonard* court concluded that the defendant had ample warning that he was committing the offense. Since his prior convictions were only an element of the offense, he was not being punished for those acts, but for the new act of possessing a firearm as a felon. *Leonard*, 391 Ill. App. 3d at 931-32.

In *Bailey*, this court came to the same conclusion when defendant, on July 26, 2006, was found in possession of four firearms, after a valid search of a furnace room in the basement of a residence where he resided. The defendant had two prior felony convictions from November 1997. The defendant was convicted of one count of the offense of armed habitual criminal and four counts of unlawful use of a weapon by a felon. In *Bailey*, we said:

> "We find no reason to depart from the holding of our sister court on this
> issue. It is clear to us that, contrary to defendant's contention here, the armed
> habitual criminal statute does not punish him for the drug offenses he committed in
> 1997 before the statute's effective date but, rather, properly punishes him for, as he
> himself points out, the new and separate crime he committed in 2006 of possessing
> firearms while having already been convicted of two prior enumerated felonies, an
> offense of which he had fair and ample warning. Accordingly, we too hold that the
> armed habitual criminal statute is not violative of the United States and Illinois
> constitutional prohibitions against *ex post facto* legislation." *Bailey*, 396 Ill. App.

3d at 464.

This court finds no reason to depart from the holding of our sister court on this issue or from what we have previously held in both *Bailey* and *Leonard*.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County. We find, first, that a rational trier of fact could have found defendant guilty beyond a reasonable doubt. We also find that the Illinois armed habitual criminal statute does not violate either the second amendment's right to bear arms or the *ex post facto* clause.

Affirmed.