2015 IL App (1st) 120089

Fifth Division
May 8, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 09 CR 3228 |
| | ) | |
| JERMAINE ROSS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Justice McBride concurred in the judgment and opinion.
Presiding Justice Palmer specially concurred, with opinion.

## OPINION

¶ 1    Following a bench trial, defendant Jermaine Ross was convicted of being an armed

habitual criminal and sentenced to 80 months' in the Illinois Department of Corrections (IDOC).

We affirmed on direct appeal, where we found that the evidence was sufficient to show that the

defendant had constructive possession of a handgun found in plain view behind the driver's seat of

a vehicle he had been driving which supported a conviction for being an armed habitual criminal.

*People v. Ross*, 407 Ill. App. 3d 931 (2011).   Defendant now appeals from the summary dismissal

of his *pro se* postconviction petition at the first stage, contending that he raised two claims of

No. 1-12-0089

arguable merit.[1] First, he contends that he was actually innocent based on an affidavit from his son who claims that the son actually committed the offense, or that trial counsel was ineffective for not properly presenting the son's affidavit into evidence or for not raising it. Second, he contends that IDOC increased his sentence without authority by imposing a three-year term of mandatory supervised release (MSR) not imposed by the trial court. For the reasons that follow, we reverse and remand with instructions.

¶ 2                             BACKGROUND

¶ 3                       I. State's Case In Chief

¶ 4     Police officer Conray Jones, a 16-year veteran of the Chicago police department, testified that he was with his partner, Officer Robert Seaberry in uniform, in a marked police vehicle when he observed Sylvester Tatum walking toward defendant's vehicle stopped along the curb on West End Avenue near Central Avenue. The police vehicle was 20 to 30 feet from the rear of defendant's parked vehicle in a traffic lane when Jones heard Tatum say "rocks and blows" to defendant, who was stopped with his vehicle running, window opened, sitting in the driver's side of the vehicle with no passengers. The officer knew that "rocks and blows" was street talk for cocaine and heroin. When Tatum noticed the police vehicle, he walked away from the parked auto. Defendant then exited the vehicle, leaving the auto running. The officers detained defendant and Tatum. Officer Jones testified to observing only the defendant and Tatum in the area. Officer Seaberry walked to the stopped vehicle and returned with a .40-caliber handgun with 10 live rounds. The

_____

[1] We originally affirmed the trial court's dismissal in an opinion filed on March 21, 2014; however, we subsequently granted defendant's petition for rehearing and withdrew the previous opinion on April 20, 2015.

- 2 -

officers then placed defendant under arrest.

¶ 5     Officer Jones's partner, Officer Seaberry, a 14-year veteran policeman, also testified that he heard Tatum say something like "rocks and blows" as they eased behind defendant's vehicle. Officer Seaberry's testimony corroborated the testimony of Officer Jones. After the police detained Tatum and defendant, Officer Seaberry walked over to defendant's vehicle, which was still running. While standing outside the vehicle, he observed the butt of a gun on the floor of the backseat, behind the driver's side, next to and partially under a black bag. Officer Seaberry testified that he made this observation from outside the vehicle while the back door was closed.

¶ 6     Officer Seaberry testified that he had previously arrested defendant's son Jemal and that, at the time of the offense in the present case, Jemal was in the area. Officer Seaberry denied under oath observing Jemal in the vehicle, but he was impeached by his testimony at the probable cause hearing when he testified that he did observe him in the vehicle. The following testimony occurred at the probable cause hearing:

> "QUESTION: Did you see Jemal Ross on that day?
>
> OFFICER SEABERRY: I did.
>
> QUESTION: You saw him in the vehicle?
>
> OFFICER SEABERRY: I did."

However, Officer Seaberry indicated that he meant defendant, not Jemal.

¶ 7     After the State presented and offered in evidence certified copies of defendant's convictions for delivery of a controlled substance, it rested its case.

¶ 8                                    II. Defense Case

¶ 9      The defense called Elizabeth Gomez, defendant's girlfriend, who testified that the vehicle belonged to her. On the morning of defendant's arrest, defendant dropped her off at work at about 9:50 a.m. and at that point in time the only item in the backseat of her vehicle was an infant car seat.

¶ 10     Defendant also testified on his own behalf that when he drove Gomez's vehicle, the only item in the backseat was the infant car seat and he denied having a gun in his possession. Defendant testified that, after he dropped off Gomez, he picked up his friend, Tyrone Patterson, and then he observed his teenage son, Jemal, on Central Avenue. Defendant stopped and told Jemal that he would be stopping a block away.

¶ 11     When defendant turned onto West End Avenue, he observed Tatum and another friend. Defendant stopped and parked the vehicle and walked across the street to talk to Tatum. Then, an unmarked police vehicle arrived, and a detective told defendant to move his vehicle because it was parked illegally. The unmarked police vehicle then left the area. Defendant then asked his friend Patterson to move the vehicle, as defendant's son Jemal approached. Then, a marked police vehicle arrived with Officers Jones and Seaberry.

¶ 12     Patterson also testified for the defense and corroborated most of defendant's testimony. However, he testified that, after he exited the vehicle after parking it, he was walking toward defendant when Jemal arrived. He observed Jemal walk toward the vehicle, open the back door and place a gun under the seat. As Patterson began to tell defendant what Jemal had done, the police arrived and detained everyone, which included defendant, Tatum, Patterson, and Jemal, and

placed all of them into a police vehicle and drove them to the police station. Patterson had three prior felony convictions and was on parole at the time of his testimony.

¶ 13    The defense also introduced 43 seconds of security camera footage that showed only Officer Seaberry walking to the backseat of the parked vehicle. Defendant testified that the video showed that the vehicle was not running.

¶ 14                                 III. State's Rebuttal Case

¶ 15    In the State's rebuttal case, Officer Jones testified that there were no people in the area other than defendant and Tatum.

¶ 16    Based on this evidence, defendant was found guilty of aggravated unlawful use of a weapon and of being an armed habitual criminal. He was sentenced to 80 months on the armed habitual criminal count, and no sentence was imposed or entered on the aggravated unlawful use of a weapon count.

¶ 17    In his posttrial motion, defendant argued that his son Jemal was unavailable at trial, because at that point in time he was hospitalized in a coma due to being shot, but since then had awoken and provided an affidavit admitting to placing the gun in the vehicle, so that a new trial should be given to him. Attached to the motion was a document, signed by Jemal but not notarized or dated, stating that he left the gun under the driver's seat of the vehicle, that he and defendant were taken to the police station, that he admitted at the station that it was his gun but "the police" (not named or described) told him that they were going to charge defendant regarding the gun nonetheless.

¶ 18    At argument on the posttrial motion, the court noted that Jemal's statement was not

notarized and thus was not an affidavit. Trial counsel told the court that he had not spoken with Jemal since his shooting, though Jemal gave a similar account earlier before being advised by his mother to remain silent, and suggested that the court subpoena Jemal for an evidentiary hearing. The court noted that, in such a hearing, it would have to advise Jemal of his right to refrain from self-incrimination and provide him an attorney. The court also ascertained from counsel that he had not witnessed Jemal sign the statement, he was not familiar with Jemal's writing, and his investigator who provided the statement was not present in court, so that there was no foundation for admitting the statement into evidence. When the State noted that defendant had demanded trial at arraignment and did not withdraw that demand or seek a continuance, the defense argued that Jemal was available at arraignment but was shot in the face at close range a few days before trial. The State further argued that, after conferring, the defense had concluded as a matter of trial strategy that there was no reason to delay trial "on the off chance that Jemal Ross, who was shot in the face [from] a few feet away, would come out of a coma." The court then denied the posttrial motion.

¶ 19    On direct appeal, we found the evidence sufficient to convict, concluding that the State and defense evidence showed that defendant alone was in possession of the vehicle when the gun was found. *Ross*, 407 Ill. App. 3d at 935-37. Gomez's testimony established that there was no gun or bag in the backseat of the vehicle when she left it, so that it was reasonable to infer that the bag and gun were placed in the backseat after she left. The officers testified that they observed no other person enter or exit the vehicle. The defense presented testimony from defendant that Patterson had also been in the vehicle, but defendant did not testify to Jemal being inside the vehicle.

Patterson testified to being in the vehicle and later to observing Jemal place the gun in the backseat. Lastly, the evidence that defendant walked away from the vehicle after he and Tatum observed the police vehicle supports a reasonable inference that defendant had knowledge of the gun's presence. Defendant's other contentions of error on direct appeal did not include ineffective assistance of trial counsel or any other challenge to the absence of Jemal's testimony.

¶ 20    In his October 2011 *pro se* postconviction petition, defendant alleged that Jemal had been previously arrested by Officer Seaberry contrary to Officer Seaberry's preliminary hearing testimony, that Jemal was unavailable to testify at trial because he had been shot a few days earlier, and that Jemal's posttrial affidavit to trial counsel's investigator was not admitted into evidence by the trial court on the grounds that it was not notarized. Defendant also alleged that he was not admonished at sentencing regarding the MSR.

¶ 21    Defendant attached a new, notarized affidavit from Jemal to his postconviction petition.[2] In the new affidavit, dated August 1, 2011, Jemal averred that he is over 18 years old, that he left the gun under the driver's seat of the vehicle, that he and defendant were taken to the police station, and that he admitted to officers that it was his gun but "the police" refused to test the gun for fingerprints and told Jemal that they wanted defendant "off the streets" and were going to charge him regardless of Jemal's admission. Jemal further averred that he told the same story to trial counsel's staff and was interviewed by a defense investigator.

¶ 22    In November 2011, the court summarily dismissed the petition. In relevant part, the court

---

[2] Hereinafter, we refer to the first, non-notarized affidavit presented with defendant's posttrial motion as "Jemal's written statement." Conversely, we refer to the second, notarized affidavit presented with defendant's postconviction petition as "Jemal's affidavit."

found that the substance of Jemal's affidavit had been introduced at trial through Patterson's testimony, which was contradicted by Officer Jones's testimony that no one other than defendant and Tatum were in the area. However, it should be noted that Officer Seaberry testified to observing Jemal in the area. The court also found that defendant's action of leaving the vehicle showed knowledge of the gun's presence even if Jemal had placed the gun in the vehicle, so that it was not evidence of actual innocence. The court found the MSR claim meritless because defendant did not provide the entire transcript of his sentencing hearing. This timely appeal followed.

¶ 23                                          ANALYSIS

¶ 24     On appeal, defendant contends that the summary dismissal of his *pro se* petition was erroneous because he raised two claims of arguable merit: (1) that he was actually innocent based on Jemal's affidavit that he placed the gun in the vehicle just before the police arrived, or that trial counsel was ineffective for not presenting an affidavit from Jemal, or appellate counsel was ineffective for not contending on direct appeal that the trial court erred in not granting a continuance to allow Jemal to testify on the posttrial motion, and (2) that IDOC increased his sentence without authority by imposing an MSR term not imposed by the trial court.

¶ 25                    I. Whether Defendant's Claim is Barred *Res Judicata*

¶ 26     As a preliminary matter, we first consider the State's argument that defendant's claim of "newly discovered evidence" is barred by *res judicata*. The State argues that the most "reasonable inference" that can be made from the record is that the trial court considered and rejected Jemal's written statement. The State argues that since Jemal's written statement contains "substantially the

same evidence" as Jemal's notarized affidavit, "this court should consider defendant's claim to be barred [by] *res judicata*."

¶ 27    "In the context of a postconviction petition, *res judicata* bars consideration of claims that were previously raised and decided on direct appeal." *People v. Wilborn*, 2011 IL App (1st) 092802, ¶ 65 (citing *People v. Blair*, 215 Ill. 2d 427, 443 (2005)); see also *People v. West,* 187 Ill. 2d 418, 425 (1999); Black's Law Dictionary 1312 (7th ed. 1999) (*res judicata* concerns "[a]n issue that has been definitively settled by judicial decision").

¶ 28    We are not persuaded by the State's argument that defendant's claim of newly discovered evidence is barred by *res judicata*. First, neither the defendant's "newly discovered" evidence claim nor the admissibility of Jemal's written statement was raised or decided on direct appeal. Second, the State's argument relies on the premise that the trial court "considered" rather than disregarded Jemal's written statement. However, as the State concedes, we can infer from the record only that the trial court mentioned the statement. Indeed, the transcript reveals only that the trial court's concerns about Jemal's written statement were (1) that the statement was not notarized and could not be called an affidavit; (2) that the attorney presenting the statement had not witnessed Jemal sign the statement and was not familiar with Jemal's writing; and (3) that the investigator who provided the statement to the attorney was not present in court, so that there was no foundation for admitting the statement into evidence. In other words, there is no indication in the record that the trial court made a definitive judicial decision based on the substance of the statement. As a result, defendant's claim of newly discovered evidence is not barred by *res judicata*.

¶ 29                                  II. Actual Innocence Claim

¶ 30    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2004)) enables

criminal defendants to initiate collateral proceedings to challenge prior convictions on grounds of

a substantial denial of constitutional rights. *People v. Barrow*, 195 Ill. 2d 506, 518-19 (2001).

Proceedings pursuant to the Act that do not involve the death penalty can be viewed as consisting

of three stages. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). To survive the first stage, a *pro se*

litigant's petition need only present the gist of a constitutional claim. 725 ILCS 5/122-2.1 (West

2004); *People v. Jones*, 213 Ill. 2d 498, 504 (2004). While this is a low threshold (*Jones*, 213 Ill. 2d

at 504), the Act allows the trial court to summarily dismiss any petition it finds frivolous or

patently without merit. 725 ILCS 5/122-2.1 (West 2004); *People v. Hodges*, 234 Ill. 2d 1, 10

(2009). At the second stage, an indigent petitioner is appointed counsel (725 ILCS 5/122-4 (West

2004)), the attorney reviews the petition, and an amended petition may be filed, and the State is

allowed to file responsive pleadings, including a motion to dismiss (725 ILCS 5/122-5 (West

2004)). If the trial court determines that the petitioner has made a substantial showing of a

constitutional violation, then the petition passes to the third stage, at which the trial court conducts

an evidentiary hearing. 725 ILCS 5/122-6 (West 2004); *People v. Edwards*, 197 Ill. 2d 239, 246

(2001).

¶ 31    As noted, a petition may be summarily dismissed if it is frivolous or patently without merit.

A petition is frivolous or patently without merit only if it has no arguable basis either in law or in

fact.  *People v. Tate*, 2012 IL 112214, ¶ 9.   A claim has no arguable basis when it is based on an

indisputably meritless legal theory (for example, one completely contradicted by the record) or a

fanciful factual allegation; that is, an allegation that is fantastic or delusional. *Hodges*, 234 Ill. 2d at 11-12; *People v. Brown*, 236 Ill. 2d 175, 185 (2010). Our review of a summary dismissal is *de novo*. *Tate*, 2012 IL 112214, ¶ 10.

¶ 32 A petition may raise a freestanding claim of actual innocence based on newly-discovered evidence. *People v. Ortiz*, 235 Ill. 2d 319, 331 (2009). Newly discovered evidence warrants retrial only when it is (1) discovered since trial and of such a nature that the defendant exercising due diligence could not have discovered it earlier, (2) material and not merely cumulative, and (3) so conclusive that it will probably change the result on retrial. *People v. Carter*, 2013 IL App (2d) 110703, ¶ 75. Evidence is cumulative when it adds nothing to what was already presented to the trier of fact at trial. *People v. Brown*, 2013 IL App (1st) 091009, ¶ 50. While claims of newly discovered evidence on postconviction petitions are not looked upon with favor and are closely scrutinized, the new evidence need not establish the defendant's innocence but only that all of the facts and circumstances, including the new evidence, warrant closer scrutiny to determine his guilt or innocence. *Carter*, 2013 IL App (2d) 110703, ¶ 75.

¶ 33 First, Jemal's affidavit is newly discovered. Evidence is newly discovered when (1) it has been discovered since the trial and (2) the defendant could not have discovered the evidence sooner through due diligence. *Ortiz*, 235 Ill. 2d at 334 (citing *People v. Morgan*, 212 Ill. 2d 148, 153 (2004)). In the case at bar, the State does not argue that Jemal's affidavit was available before defendant's conviction, so the first part of the "newly discovered evidence" definition would be satisfied. See *People v. Parker*, 2012 IL App (1st) 101809, ¶ 82 ("[T]he State does not argue that the codefendant's statements were actually discovered before trial, so the first part of the 'newly

- 11 -

discovered' definition is satisfied."). Additionally, no amount of due diligence on defendant's part could have compelled Jemal to provide the evidence any sooner than he did. Jemal was in a coma during defendant's trial. Moreover, even if Jemal was not in a coma, defendant could not have forced Jemal to provide self-incriminating statements that it was Jemal, not defendant, who possessed the handgun and placed it in the vehicle.[3] See *Parker*, 2012 IL App (1st) 101809, ¶¶ 83-84; see also *People v. Molstad*, 101 Ill. 2d 128, 135 (1984) ("[N]o amount of diligence could have forced the codefendants to violate their fifth amendment right to avoid self-incrimination (U.S. Const., amend. V *** ) if the codefendants did not choose to do so.").

¶ 34    Second, Jemal's affidavit is material, and not merely cumulative, to the evidence presented at defendant's trial. Evidence is cumulative when it adds nothing to what was already presented to the trier of fact. *People v. Brown*, 2013 IL App (1st) 091009, ¶ 50. In the present case, Patterson testified that he witnessed Jemal place the handgun in the vehicle, and Jemal's affidavit adds the first-person perspective to Patterson's testimony. Undeniably, a first-hand account is more credible than one witness blaming a third-party not before the court. See *Ortiz*, 235 Ill. 2d at 335-36 (holding that "testimony [that] supplied a first-person account of the incident" "added to what was before the fact finder"); see also *Molstad*, 101 Ill. 2d at 135 (holding that, although defendant presented alibi testimony at trial, the affidavits of convicted codefendants stating that defendant was not present at the crime were not cumulative as they raised "additional questions concerning the trial court's verdict" and "[went] to an ultimate issue in the case"). Therefore, we

---

[3] While the record does not reveal exactly what criminal offense Jemal's statements implicate, there appears to be no dispute that his statements are "self-incriminating." Technically, Jemal was not a codefendant here.

cannot conclude that Jemal's affidavit "adds nothing" to what was presented to the original trier of fact in defendant's trial.

¶ 35    Lastly, Jemal's affidavit, in which he admits to placing the firearm in the vehicle, is evidence, if believed, that is " 'of such conclusive character that it would probably change the result on retrial.' " *Ortiz*, 235 Ill. 2d at 333 (quoting *Morgan,* 212 Ill. 2d at 154). As we noted when we previously considered defendant's conviction:

> "A person commits the offense of being an armed habitual criminal if he 'receives, sells, possesses, or transfers any firearm' after having been convicted of at least two triggering offenses. 720 ILCS 5/24-1.7 (West 2008). To establish guilt on a theory of constructive possession of a firearm, the State must prove: (1) that defendant had knowledge of the presence of the weapon; and (2) that defendant exercised immediate and exclusive control over the area when the weapon was found. *People v. McCarter,* 339 Ill. App. 3d 876, 879 (2003). A trier of fact is entitled to rely on reasonable inferences of knowledge and possession." *Ross*, 407 Ill. App. 3d at 935.

In effect, Jemal's affidavit attests that defendant did not exercise "immediate and exclusive control over the area when the weapon was found." *McCarter,* 339 Ill. App. 3d at 879. Indeed, if believed, Jemal's affidavit could exculpate defendant under the State's theory of constructive possession.

¶ 36    We acknowledge that we previously found sufficient evidence to uphold defendant's conviction. See *Ross*, 407 Ill. App. 3d at 937. We found that "[d]efendant's conduct in leaving the vehicle provides a reasonable inference of flight to avoid the police and further supports a reasonable inference that defendant possessed the gun." *Ross*, 407 Ill. App. 3d at 937. However, as

Jemal's affidavit directly rebuts the State's theory of constructive possession, we find that it is " 'of such conclusive character that it would probably change the result on retrial.' " *Ortiz*, 235 Ill. 2d at 333 (quoting *Morgan,* 212 Ill. 2d at 154).

¶ 37     Given that (1) neither Jemal's testimony nor his affidavit was available until *after* defendant's conviction, (2) Jemal's affidavit adds a material first-person perspective to Patterson's testimony, and (3) Jemal's affidavit, if believed, conclusively negates the State's theory of constructive possession, we cannot find that defendant's petition has no arguable basis either in law or in fact. See *Tate*, 2012 IL 112214, ¶ 9. Therefore, the trial court erred when it summarily dismissed defendant's *pro se* postconviction petition in the first stage. See 725 ILCS 5/122-2.1 (West 2004); see also *Jones*, 213 Ill. 2d at 504. Accordingly, we reverse the trial court's summary dismissal of defendant's postconviction petition and do not reach defendant's alternative arguments.

¶ 38                                  III. MSR Claim

¶ 39     Finally, we dispose of the MSR claim by noting that our supreme court recently rejected such a claim, holding that MSR was not imposed by IDOC but by the trial court by operation of law when it imposed a sentence of imprisonment. *People v. McChriston*, 2014 IL 115310.

¶ 40     In *McChriston,* the supreme court rejected the defendant's separation-of-powers argument, raised in a petition under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)), that the IDOC impermissibly added a three-year MSR term to his 25-year sentence because the trial court did not refer to the mandatory MSR term. *McChriston*, 2014 IL 115310, ¶ 3. The supreme court reasoned that the General Assembly may enact legislation that includes a MSR

term in a sentence by operation of law. *McChriston*, 2014 IL 115310. Construing the plain language of section 5-8-1(d) of the Unified Code of Corrections (730 ILCS 5/5-8-1(d) (West 2004)), the court held that a sentence includes a period of MSR "as if it were written within the sentence," even if the court did not mention the MSR period at the sentencing hearing or include it in the sentencing order. *McChriston*, 2014 IL 115310, ¶¶ 16-17. Therefore, the supreme court noted the IDOC did not in fact add the MSR term to defendant's sentence but, instead, it was added by operation of law. *McChriston*, 2014 IL 115310, ¶¶ 16-17. Accordingly, we must also reject defendant's identical separation-of-powers argument in the instant appeal. *McChriston*, 2014 IL 115310, ¶ 23.

¶ 41     In addition, *McChriston* held that the imposition of MSR did not violate federal due process, rejecting the defendant's argument that the imposition of the three-year term of MSR impermissibly increased his sentence because only the court retained the authority to increase his sentence. *McChriston*, 2014 IL 115310, ¶¶ 25-31. The supreme court noted that "the enforcement of the mandatory MSR term in this case was not an increase in sentencing, as the MSR term attached automatically as though written into defendant's sentence." *McChriston*, 2014 IL 115310, ¶ 31. In accordance with the holding in *McChriston*, we also must reject defendant's identical argument based on federal due process.

¶ 42                                  CONCLUSION

¶ 43     In conclusion, (1) the trial court erred when it summarily dismissed defendant's *pro se* postconviction petition in the first stage because Jemal's affidavit is newly discovered evidence, and (2) defendant's due process rights were not violated since defendant's term of MSR was

imposed by operation of law.

¶ 44 Reversed and remanded with instructions.

¶ 45 Presiding Justice Palmer, specially concurring.

¶ 46 I concur in the judgment of this court. I write separately to expand the discussion of what I consider to be some of the unique aspects of this case and the main reasons I feel it must be remanded for further proceedings.

¶ 47 In its analysis of the issue of newly discovered evidence, the majority states that, "Jamal's affidavit is newly discovered," and "the State does not argue that Jemal's affidavit was available before defendant's conviction, so the first part of the 'newly discovered evidence' definition would be satisfied." *Supra* ¶ 33. While I agree with the ultimate conclusion that Jamal's potential testimony constitutes newly discovered evidence, I come to that conclusion in a slightly different way.

¶ 48 I agree with the State that the initial focus here should not be on when the affidavit became available but, rather, when the evidence contained in the affidavit became known. Then, the next question should be whether that was evidence available at trial. The affidavit is not the evidence; the testimony contained within the affidavit is the evidence. The appropriate inquiry, I believe, is whether, at the time of trial, the defendant was aware of the potential testimony that Jamal had to offer and was that potential testimony available at trial.

¶ 49 In *People v. Edwards*, 2012 IL 111711, ¶¶ 10-12, our supreme court analyzed third and fourth successive postconviction petitions which had attached the affidavits of two alibi witnesses as well as an affidavit from a codefendant that indicated that the defendant was not involved. As to

the alibi witnesses, even though the affidavits were later obtained, the court cited with approval the appellate court's finding that the defendant necessarily knew of the existence of the evidence at the time of trial. *Id.* ¶ 34. The supreme court cited with approval the appellate court's holding in this regard:

> " 'It is illogical for defendant to claim that this evidence of his alibi is new, where he obviously knew of his alibi at the time of trial, on appeal and during initial postconviction proceedings.' " *Id.* ¶ 34 (quoting *People v. Edwards,* 403 Ill. App. 3d 1101 (table) (2010) (unpublished order under Supreme Court Rule 23)).

¶ 50    The supreme court further concluded that, with regard to the alibi witnesses, not only was this not new evidence, but it was not shown that it was unavailable at trial. *Edwards*, 2012 IL 111711, ¶¶ 36-37.

¶ 51    As to the codefendant's affidavit, the court noted that, "petitioner obviously knew of [the codefendant] at the time of trial." *Edwards*, 2012 IL 111711, ¶ 38. However, the court held that, as a result of the codefendant's fifth amendment rights, "the evidence in [the codefendant's] affidavit apparently was nevertheless 'unavailable at trial.' " *Id.* See also *People v. Molstad*, 101 Ill. 2d 128 (1984) (evidence contained in affidavits of five codefendants presented at motion for new trial constituted newly discovered evidence as, although known at trial, unavailable due to their fifth amendment rights).

¶ 52    Similarly, in the case at bar, there is no question that the testimony that Jemal could offer was known to defendant prior to trial.   Jemal was on defendant's witness list. Defendant testified that Jamal was present on the scene. Tyrone Patterson, defendant's witness, testified at trial that

Jemal put the gun in the car. Jemal's potential testimony, the evidence, was known to defendant at the time of trial.

¶ 53     That, however, does not win the day for the State on the question of whether this evidence is considered "newly discovered evidence" for the purposes of this proceeding. There is no question that this evidence, while known to defendant, was unavailable to him at trial. Just as the codefendant's testimony was unavailable to the defendant in *Edwards* due to his fifth amendment rights, the testimony here was unavailable due to the fact that Jemal was in a coma at the time of trial as a result of being shot immediately before the start of this trial. As a result, for the purposes of this postconviction petition, I believe that Jemal's potential testimony should be considered to be newly discovered evidence.

¶ 54     I am of course aware of, and I am troubled by, the fact that defendant answered ready for and demanded trial while this potential witness was unavailable. The State claims defendant strategically chose not to present a witness at trial and that, having lost, he is now trying to get "a second bite at the apple in the form of an opportunity to look back, with hindsight, at a strategy that did not succeed at trial and try again by using a different route." The State calls this gamesmanship.

¶ 55     As noted, I find the trial demand to be troubling. However, this case presents a very unique factual situation, and as a result of those facts, I do not find the State's argument here persuasive. The common law record reveals that defendant demanded trial in a branch court on February 5, 2009, and that he maintained that trial demand through arraignment and up until the day of trial. Starting with his arrest date, that was a period of almost three months. According to the defense attorney's arguments before the trial court, Jemal was shot only three or four days

before the trial date. Jemal's shooting and subsequent coma were obviously unforeseen events that occurred while defendant was pursuing a strategy of maintaining a trial demand throughout the entire proceeding, which he had a right to do. It is undisputed, and must be taken as true at this point, that Jemal was in a coma on the date of trial and that no one knew when or if he would regain consciousness. Under these unique facts, I don't find that the trial demand should negate the conclusion that Jemal was unavailable at trial.

¶ 56    Next, I agree with the majority that Jemal's potential evidence is not cumulative. As the majority noted, a confession to a crime carries more weight than a third-party witness accusing someone other than the defendant. I would also posit another reason why this is not cumulative evidence. The only witness that put the gun in the hands of Jemal was Patterson. However, Patterson was impeached by his three felony convictions, two for drugs and one for possession of a weapon by a felon. It is easy to see why his testimony was not given much weight. Should Jemal come to the witness stand and not suffer the same impeachment, his testimony may be more persuasive. Of course, Jemal's testimony will presumably be attacked on other grounds, such as his failure to come forward earlier, his self-interest in saving his father, as well as the effect of the passage of the statute of limitations. However, those are matters for the trier of fact.

¶ 57    Lastly, I find it necessary to discuss what occurred at the hearing on the motion for new trial. By the time of the hearing, Jemal was no longer comatose. Thus, prior to entry of final judgment in this matter, his testimony became available. Inexplicably, defense counsel failed to present him to the court to testify at the hearing. Further, he failed to even present an affidavit from Jemal such as the one attached to this postconviction petition. Instead, defense counsel only

provided the court with an unsworn statement which even he admitted he could not authenticate.

¶ 58    Upon presentation of this unsworn statement, a lengthy discussion ensued between the court and counsel concerning the requirements for a document to qualify as an affidavit, the fact that the statement did not qualify as an affidavit, and whether it should suffice in lieu of an affidavit.   During the course of this discussion, the court inquired of defense counsel as to why he had not brought Jemal to court to testify under oath at the hearing now that he had regained consciousness.   It was at this point that defense counsel asked to continue the hearing so that he could bring Jemal to court so that he could so testify.   Unfortunately, this request was never ruled upon, but, in effect, it was denied, as the next ruling was the denial of the motion for new trial.

¶ 59    Defendant claims that as a result of Jemal's testimony not being considered by the trial court at this posttrial hearing, he received ineffective assistance of counsel. The State responds that these claims are forfeited as they were not raised on direct appeal and that they were also not raised in defendant's *pro se* postconviction petition. I have come to the conclusion that these claims have not been forfeited. First, for the same reason the majority finds that *res judicata* does not apply, I find that these issues could not have been raised on direct appeal because the trial court did not allow the unsworn and unauthenticated written statement to be admitted into evidence and it is clear that it was not considered.   Second, I find that these claims were sufficiently set forth in the *pro se* postconviction petition.   In his *pro se* postconviction petition, defendant states the following:

> "Petitioner contends that evidence of [a] conclusive nature that was not available at the time of trial & sentence hearing, [d]ue to the fact that a key witness

(Jemal Ross) was shot a few days before the trial and was in a coma unable to appear before the court and testify on behalf of the defendant (Jermaine Ross)[.] At the time of the sentence hearing[,] defendant's counsel had his investigator to [*sic*] obtain a written statement from Jemal Ross, who was in recovery on bed-rest at home. The written statement corroborated & supported defendant[']s innocence. *The court could not allow the written statement without being notarized*[] *as a*[*n*] *affidavit* [*sic*]. But since then[,] the written statement has been notarized and signed by Jemal Ross." (Emphasis added.)

¶ 60    Our supreme court has repeatedly held that a *pro se* petitioner need only provide "a limited amount of detail" and need not include "legal arguments or [citations] to legal authority." (Internal quotation marks omitted.) *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).   Further, "[w]hile in a given case the *pro se* defendant may be aware of all the facts pertaining to his claim, he will, in all likelihood, be unaware of the precise legal basis for his claim or all the legal elements of that claim." *Id.* at 245.   Keeping in mind these tenets of liberal construction, I find that these claims were sufficiently set forth in the *pro se* post conviction petition to avoid forfeiture. While not using the phrase, "ineffective assistance of counsel," defendant has clearly attempted to communicate to the court that his counsel's failure to provide Jemal's testimony to the court in an acceptable manner prevented it from being considered.

¶ 61    Taking into consideration all of the above facts, I believe that it is at least arguable that defense counsel's performance at this hearing was objectively unreasonable to the prejudice of

defendant for several reasons. First, defense counsel failed to provide the court with a sufficient affidavit of Jemal setting forth his proposed testimony. In the alternative, he failed to produce Jemal at the hearing so that he could testify. In the event that Jemal was not immediately available, counsel also did not at the outset properly request a continuance for that purpose. Further, once it became clear that the trial court was not satisfied with the unsworn statement, defense counsel did request a continuance. However, the court never ruled upon that motion and simply denied the motion for new trial. At the very least, defense counsel should have secured a ruling on his motion for a continuance.

¶ 62 During the hearing on the motion for new trial, defense counsel expressed some vague concerns regarding the legitimacy of the unsworn statement. It may have been questionable. On the other hand, as we are now confronted with an actual sworn affidavit of Jemal confessing to possessing the gun, it may not have been. Had a continuance been granted, there would have been several potential outcomes. Defense counsel may have failed to produce Jemal on the continuance date and the matter would have been resolved. Jemal may have appeared, testified, and been found not credible, and the motion would have been denied. Lastly, Jemal may have appeared, testified, and been found credible, resulting in the grant of a new trial. In any event, had defense counsel secured a continuance for the purpose of presenting this newly available testimony, this issue would have been resolved, as well as foreclosed, on collateral review.