**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210341-U

Order filed May 12, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-21-0341 Circuit No. 13-CF-1631 |
| ANTONIO M. BOGAN, | ) ) ) | Honorable David M. Carlson, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Hettel and Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1   *Held*: We reverse the trial court's first-stage dismissal of defendant's postconviction petition where defendant raised an arguable claim of actual innocence.

¶ 2   Following a bench trial, defendant Antonio M. Bogan was convicted of being an armed habitual criminal, having previously been convicted two or more times of armed robbery (720 ILCS 5/24-1.7 (a)(1) (West 2012)), and defacing the identification marks of a firearm (720 ILCS 5/24-5(b) (West 2012)). The trial court sentenced defendant to concurrent prison terms of 30 years and 5 years, respectively. On direct appeal, defendant argued that the evidence was insufficient to

show the element of possession. *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 1 (*Bogan I*). This court, though disagreeing with the State's assertion that the evidence was overwhelming, nevertheless determined it was sufficient to affirm. *Id.* ¶¶ 35, 50. Defendant subsequently filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), alleging actual innocence and attaching the affidavit of a witness previously unknown to him who claimed to have placed the firearm in a vehicle titled to defendant, without defendant's knowledge, shortly before the firearm was discovered by police. The trial court summarily dismissed the first-stage petition. For the reasons that follow, we reverse the dismissal and remand for second-stage proceedings.

¶ 3                                   I. BACKGROUND

¶ 4         As set forth more fully in *Bogan I*, 2017 IL App (3d) 150156, the following evidence was presented at trial. On July 27, 2013, members of the Joliet police department sought to apprehend defendant for another crime. Initially, the police stopped a white Chevrolet Impala, which they believed belonged to defendant near defendant's apartment, but defendant was not in the vehicle. Shortly thereafter, the police observed a green Oldsmobile Cutlass in defendant's parking lot, which was also registered to defendant. An officer noticed defendant sitting on the front porch of his apartment. Defendant initially denied knowing who owned the Cutlass. When the police informed him that they knew that he was the title owner, defendant responded that he had sold the Cutlass to Micah Smith two weeks earlier.

¶ 5         The police arrested defendant for the other offense, defendant consented to a search of his apartment, the police took defendant's cell phone into evidence, and the police obtained a search warrant for the Cutlass. The police obtained defendant's key chain, which contained keys to the

2

Impala and his apartment but not the Cutlass. The Cutlass keys were not recovered in the apartment search. The police used a slim jim tool to open the Cutlass.

¶ 6     In the Cutlass, the police found the firearm that defendant was charged with possessing: a .40-caliber semi-automatic handgun with a scratched-off serial number. The .40-caliber handgun was located in a stack of items on the back driver's side floorboard. On top of the stack was a red plastic bag containing, among other items, defendant's insurance card. Beneath the red bag was the .40-caliber handgun, as well as a .22-caliber revolver, both wrapped in a black sweatshirt. Beneath the black sweatshirt was a zipped bag containing five empty rifle magazines and two boxes of ammunition, one of which was for an AR-15 style rifle. Defendant's fingerprints were later found on the box of ammunition for the AR-15 style rifle. An AR-15 style rifle was found in a garment bag laying across the back seat of the Cutlass. Two pictures of the AR-15 style rifle were found on defendant's phone, the more recent of which was taken 12 days earlier on July 15, 2013.

¶ 7     At trial, defendant objected to evidence of the AR-15 style rifle, as he was not charged with possessing that firearm. The trial court overruled the objection, agreeing with the State that the AR-15 style rifle, when taken together with its picture and defendant's fingerprints, were probative of defendant's control over the Cutlass and knowledge of what was inside it. Other items linking defendant to the Cutlass included a set of bow and arrows (the target for which had been found in defendant's apartment); a March 3, 2013, towing receipt for the Cutlass signed by defendant; and a March 18, 2013, store receipt bearing defendant's name and address.

¶ 8     Defendant testified in his own defense that, although the Cutlass was titled to him, he purchased it in March 2013 for his close friend, Anton Spencer, and Spencer's girlfriend, Micah Smith. Defendant believed the two to be unable to purchase their own car due to having suspended

3

licenses. Defendant admitted to being in the Cutlass in March 2013, when he picked up the car from a towing facility for Spencer and when Spencer drove him to a store. He admitted to touching Spencer's ammunition box, saying that he saw no harm in looking at it. He did not see the AR-15 style rifle in person; Spencer only sent him a picture of it. Defendant guessed that Spencer put the red bag with the insurance card in the Cutlass, as Spencer frequented defendant's apartment.

¶ 9 On the date of the incident, defendant was getting ready to be picked up by his girlfriend to visit her brother in the hospital. He allowed a friend, Timothy Potter, to take his Impala. Potter was a mechanic who was going to fix the Impala's brakes. Also in the Impala were Potter's girlfriend and Spencer. The trio was stopped by police upon their return to defendant's apartment.

¶ 10 When the police saw and questioned defendant, defendant did not inform them that Spencer, as well as Smith, owned the Cutlass. Defendant had not noticed the Cutlass when he went outside the morning of the incident. He first noticed the Cutlass parked outside later in the day. Although Spencer was standing in the vicinity, defendant did not want to "put my brother out there. I don't know what he has in that car." At the time the police executed the search warrant for the Cutlass, defendant was being processed at the police station for the other offense. Following his arrest, defendant tried to locate Spencer but was unsuccessful ("He abandoned me"; "We tried to get ahold of both of them" (referring to Spencer and Smith)).

¶ 11 The trial court convicted and sentenced defendant as stated. On appeal, defendant argued that the State failed to prove that he constructively possessed the .40-caliber handgun. *Bogan I*, 2017 IL App (3d) 150156, ¶ 1. As defendant was not found in actual possession of the .40-caliber handgun, the State was required to prove constructive possession by showing defendant's: (1) immediate and exclusive control over the area where the firearm was found; and (2) knowledge of the presence of the firearm. *Id.* ¶ 27.

4

¶ 12    This court determined that the evidence was sufficient to establish defendant's control over the Cutlass. *Id*. ¶ 42. Defendant purchased the Cutlass and was the legal owner. *Id*. ¶ 31. Numerous items belonging to defendant were found in the Cutlass, and defendant's phone had a recent picture of what may have been the AR-15 style rifle located in the Cutlass. *Id*. ¶ 33. From this evidence, a rationale trier of fact could conclude that defendant was a regular driver of the vehicle. *Id*. ¶ 36. We acknowledged that defendant provided an innocent explanation for his connection to the Cutlass and that the Cutlass keys were not on defendant's key chain nor were they ever recovered, but we reasoned that these discrepancies were for the trier of fact to resolve. *Id*.

¶ 13    We also determined that the evidence was sufficient to establish defendant's knowledge of the firearm. *Id*. ¶ 46. We explained that knowledge may be inferred from a defendant's regular, ongoing control and concluded that the numerous connections between defendant and the Cutlass could allow a trier of fact to infer that defendant would know what was in it. *Id*. ¶ 45. We further explained that the "precise location of the evidence found in the [Cutlass] gives rise to an independent inference of knowledge." *Id*. ¶ 47. That is, because the items at the bottom and top of the stack, *i.e.*, ammunition box with defendant's fingerprints and defendant's insurance card, could each be linked directly to defendant, it was highly unlikely that he was not aware of the .40-caliber handgun in the middle of the stack. *Id*. "It would similarly undermine any inference that the weapon was placed in the [Cutlass] by another person." *Id*. Having determined that there was sufficient evidence of defendant's control and knowledge, we affirmed his convictions. *Id*. ¶ 48.

¶ 14    On July 16, 2021, defendant filed the instant *pro se* postconviction petition, alleging actual innocence based on newly discovered evidence. Defendant attached the affidavit of Johnnie Bankston, and argued that the affidavit negated the State's theory at trial and corroborated

defendant's trial testimony. Defendant further argued that he did not know Bankston prior to trial, he discovered the evidence after his trial, and the evidence was not previously available to him through the exercise of diligence.

¶ 15    In his affidavit, Bankston attested that the .40-caliber handgun was his. Spencer, an acquaintance of his, had agreed to help sell the handgun. Spencer picked up Bankston in Chicago Heights in a green Cutlass. Bankston gave Spencer the handgun, Spencer "check[ed] it out," and Spencer then put it, together with a .22-caliber handgun, inside a black sweatshirt and behind the seat. They drove toward Joliet to make the sale. During the drive, Spencer explained that he was going to sell the .40-caliber handgun, the .22-caliber handgun, and an AR-15 rifle (which Bankston never saw) to the same person. When they arrived in Joliet, the buyer was not ready. As such, they drove to an apartment complex where two of Spencer's female friends lived. Spencer parked the Cutlass outside the apartment and left the firearms in the Cutlass. They had been in the apartment for about an hour when Spencer got a call. Spencer left, saying he would be right back, and Bankston stayed in the apartment. About 90 minutes later, Spencer returned, telling Bankston that he had been detained by the police, his car was surrounded by police, and his friend "Tone" had been arrested for reasons unknown to him. Spencer and Bankston stayed in the apartment until the police left. At that point, they saw the Cutlass was gone. At 11 p.m., Spencer drove Bankston back to Chicago Heights in the Impala.

¶ 16    Bankston lost contact with Spencer and was later arrested for an unrelated crime. For years, Bankston thought Spencer stole his gun or the buyer set him up. "[I]t didn't make sense to me for the police to show up out of the blue and mess with a car parked in a lot with many other vehicles." However, in 2019, while in the Lawrence Correctional Center, Bankston overheard defendant "talking about being sentenced to 30 years at 85% in Joliet for constructive possession of a defaced

6

Hi-Point .40-caliber found in a [C]utlass registered in his name but actually owned and driven by somebody he thought was a friend." Bankston approached defendant, spoke with him further, and realized that defendant had been Spencer's friend "Tone." Bankston told defendant that the .40-caliber handgun had been his. Defendant immediately asked Bankston to so attest in an affidavit. Bankston initially declined, fearing it would negatively impact his pending appeal or result in additional charges. However, his conscience started "messing" with him to the point that he could no longer sleep. Bankston's affidavit provided in conclusion:

"So, I declare, without any threats or promises being made, that on July 27, 2013, I put the defaced Hi-Pointed .40 caliber handgun in the green Cutlass when I agreed to ride with Anton Spencer to Joliet to sell the gun. I also declare that Antonio Bogan was not present when I put the gun in the car and he didn't give me permission to do so."

¶ 17    On July 20, 2021, the trial court summarily dismissed defendant's first-stage petition, providing in a written order that the issues raised "do not merit further post-conviction review." This timely appeal followed.

¶ 18                                II. ANALYSIS

¶ 19    Defendant argues that the trial court erred in dismissing his *pro se* postconviction petition at the first stage. The Act provides a mechanism by which criminal defendants may assert that their convictions or sentences were the result of a substantial violation of their constitutional rights. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). A freestanding claim of actual innocence is cognizable under the Act. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). The Act provides for a three-stage proceeding. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006) (non-death penalty cases). At the first stage, the trial court has 90 days to review the petition without input from the State. 725 ILCS 5/122-2.1(a)(2) (West 2020). At the second stage, the trial court may

appoint counsel for the defendant, if the defendant is indigent. *Id*. § 122-4 (West 2020). After counsel has had the opportunity to make any necessary amendments to the petition, the State may answer or move to dismiss. *Id*. § 122-5. Finally, at the third stage, the trial court conducts an evidentiary hearing to determine whether a new trial is warranted. *Id*. § 122-6.

¶ 20    Where the trial court dismisses the petition at the first stage, our review is *de novo*. *People v. Tate*, 2012 IL 112214, ¶ 10. A postconviction petition should survive the first stage so long as it presents the gist of a constitutional claim and is not frivolous or patently without merit. *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition is frivolous or patently without merit if it has no arguable basis in law (such as an indisputably meritless legal theory) or in fact (such as a claim that is completely contradicted by the record, fantastic, or delusional). *Id*. at 16-17. The "gist" standard is a low threshold that is easy to satisfy. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). Courts should review first-stage petitions with " 'a lenient eye, allowing borderline cases to proceed.' " *Hodges*, 234 Ill. 2d at 22 (quoting *Williams v. Kullman*, 722 F. 2d 1048, 1050 (1983)). The factual allegations should be liberally construed in the petitioner's favor and a petitioner need not allege facts supporting all of the elements of a constitutional claim (*People v. Brown*, 236 Ill. 2d 174, 188-89 (2010)), as higher standards await the petitioner in the later stages of the proceedings.

¶ 21    Relevant here, for a freestanding claim of actual innocence to survive the first stage, the petition and supporting documents need only make an arguable showing that the evidence supporting actual innocence is: (1) newly discovered, (2) material and not merely cumulative, and (3) of a conclusive character. *People v. White*, 2014 IL App (1st) 130007, ¶ 19. As we explain, the petition and supporting documents here make an arguable showing as to each of the three prongs.

8

¶ 22                                A. Newly Discovered

¶ 23        Newly discovered evidence is evidence that was unavailable at the original trial and could

not have been discovered sooner through the exercise of diligence. *People v. Burrows*, 172 Ill. 2d

169, 180 (1996). The question of Bankston's unavailability turns on defendant's diligence in

locating him and in Bankston's fifth amendment right against self-incrimination. Bankston

attested that he did not know defendant prior to 2019. Even then, it took defendant two years to

convince Bankston to share his version of events in an affidavit. Bankston further attested that,

initially, he was not ready to share his version of events, because he did not want to jeopardize his

pending appeal or be charged with additional offenses. Indeed, it has been held that no amount of

diligence can force a witness to violate his fifth amendment right to self-incrimination if he does

not choose to do so. *People v. Molstad*, 101 Ill. 2d 128, 135 (1984).

¶ 24        The State does not address defendant's diligence in locating and procuring Bankston's

testimony. Rather, the State's sole diligence argument concerns Spencer. We observe that

Spencer, like Bankston, would have been reluctant to incriminate himself. Per Bankston, the two

hid in an apartment until the police left the scene. The State nevertheless reasons that, had

defendant gotten Spencer to cooperate, Spencer would have informed defendant of Bankston: "[I]f

defendant had exercised due diligence, he could have discovered the information about Bankston

simply by discussing the matter with Spencer." The State does not acknowledge that defendant

testified at trial that he tried to locate Spencer but could not find him. Nor does the State

acknowledge Spencer's own fifth amendment concerns were he to implicate Bankston. More

significantly, we note that defendant's diligence in procuring Spencer was ancillary to his diligence

in procuring Bankston. Bankston's revelations to defendant are at least arguably newly discovered

evidence.

¶ 25                    B. Material and Not Merely Cumulative

¶ 26          Evidence is material if it is probative of the petitioner's innocence. *People v. Coleman*, 2013 IL 113307, ¶ 96. Defendant urges that Bankston's affidavit is probative of his innocence in that it "focuses centrally on the knowledge element of constructive possession, illustrating that defendant did not know the firearm was in the Cutlass." We agree.

¶ 27          Bankston attested that defendant was not present when he brought the .40-caliber handgun into the Cutlass. Bankston did not tell defendant that the handgun was in the Cutlass. Bankston did not even know defendant. Bankston explained that he left the handgun in the Cutlass shortly before the Cutlass was searched by the police. Thus, Bankston offered a plausible explanation as to why defendant was unaware of the firearm found in a vehicle that he frequented.

¶ 28          The State counters that "Bankston's affidavit does nothing to negate a finding of knowledge as Bankston has no information as to whether Spencer shared information about the gun with defendant." However, that Bankston's affidavit is silent as to whether Spencer shared information about the firearm with defendant does not mean that Bankston's affidavit lacks probative value on the element of knowledge for the reasons stated above.

¶ 29          Evidence is cumulative when it adds nothing to what the fact finder heard during trial. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009); *People v. Ross*, 2015 IL App (1st) 120089, ¶ 34. *Ross*, also a constructive possession case, is instructive. There, a witness named Patterson testified at trial that he saw the defendant's son, not the defendant, place the firearm in the back seat of the vehicle. *Ross*, 2015 IL App (1st) 120089, ¶ 12. After the defendant's conviction was affirmed on direct appeal, defendant filed a *pro se* postconviction petition, attaching his son's affidavit. *Id.* ¶ 20. The son had been unavailable to testify at trial because he had been in a coma. *Id.* ¶¶ 17, 20. The trial court nevertheless dismissed the petition at the first stage, finding, in part, that the

10

evidence in the son's affidavit was cumulative of Patterson's trial testimony. *Id.* ¶ 22. The appellate court disagreed, explaining that the son's affidavit "adds [a] first-person perspective to Patterson's testimony. Undeniably, a first-hand account is more credible than one witness blaming a third-party not before the court." *Id.* ¶ 34 (citing *Molstad*, 101 Ill. 2d at 135 (holding that, although defendant testified at trial that he was not present at the crime and his parents corroborated his testimony, the affidavits of the convicted codefendants stating that defendant was not present were not cumulative as they raised additional questions regarding the trial court's verdict)).

¶ 30        Here, as in *Ross*, the affidavit adds a first-person account as to how the firearm was placed in the Cutlass. This testimony is more probative than a self-interested party (defendant) speculatively blaming another party (Spencer) who was not before the court. The State's arguments that the affidavit is cumulative because it is consistent with defendant's trial testimony that the .40-caliber firearm was not his are not well-taken. The affidavit provides numerous details not introduced at trial, including who owned the firearm, how it was placed in the Cutlass, and how long it had been in the Cutlass before the police discovered it.

¶ 31                                                C. Conclusive Character

¶ 32        Evidence is of a conclusive character if, when considered along with the trial evidence, it would probably lead to a different result. *Coleman*, 2013 IL 113307, ¶ 96. The new evidence need not be completely dispositive. *Id.* ¶ 97. Rather, the court should consider whether the evidence supporting the petition places the trial evidence in a different light such that it undermines the court's confidence in the judgment of guilt. *Id.*

¶ 33        Here, at trial, defendant's version of events was uncorroborated and his connection to the Cutlass, not to mention items in the Cutlass connected to defendant and proximate to the gun, proved constructive possession. Bankston's affidavit arguably places this evidence in a different

11

light as it relates to defendant's knowledge. Indeed, in *Bogan I*, we noted that it was unlikely defendant would not have known about a firearm located in the middle of a stack of items linked to him. However, Bankston explained how Spencer put the firearm there shortly before it was discovered by police. Taking this evidence as true and considering it alongside an evidentiary weakness noted in *Bogan I, i.e.*, that the keys to the Cutlass were not on defendant's key chain and were never recovered, persuades us that it is at least arguable that the trial court would have reached a different result if it had had the benefit of the new evidence. We noted on direct appeal that the State's evidence was not overwhelming and defendant has now offered evidence to explain what we previously identified as weaknesses in his case. Thus, we cannot say that defendant has not made at least an arguable showing of actual innocence such that his petition should advance to the second stage.

¶ 34                                III. CONCLUSION

¶ 35        The judgment of the circuit court of Will County is reversed and remanded.

¶ 36        Reversed and remanded.